**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

THE CITY OF SPRINGFIELD, MISSOURI,                    PLAINTIFF

        Plaintiff,

v.

PURDUE PHARMA, L.P.; PURDUE PHARMA,
INC.; THE PURDUE FREDERICK COMPANY,                    DEFENDANTS
INC.; TEVA PHARMACEUTICAL
INDUSTRIES, LTD; TEVA
PHARMACEUTICALS USA, INC.; CEPHALON,
INC.; JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC.; NORAMCO, INC.;
MALLINCKRODT plc; MALLINCKRODT LLC;
MALLINCKRODT ENTERPRISES, LLC;
JOHNSON & JOHNSON; ENDO HEALTH
SOLUTIONS, INC.; ENDO
PHARMACEUTICALS, INC.; INSYS
THERAPEUTICS, INC.; INSYS PHARMA, INC.;
ALLERGAN plc; ACTAVIS plc; ACTAVIS, INC.;
ACTAVIS LLC; ACTAVIS PHARMA INC.;
WATSON PHARMACEUTICALS, INC.;
WATSON PHARMA, INC.; WATSON
LABORATORIES, INC.; MCKESSON
CORPORATION; CARDINAL HEALTH 5, LLC;
CARDINAL

DEFENDANTS

HEALTH 100, INC.; CARDINAL HEALTH 108,
LLC; CARDINAL HEALTH 110, LLC;
CARDINAL HEALTH 113, LLC; CARDINAL
HEALTH 122, LLC; CARDINAL
HEALTH 132, LLC; CARDINAL HEALTH 200,
LLC; CARDINAL HEALTH 201,
LLC; CARDINAL HEALTH 414, LLC;
AND THE HARVARD DRUG GROUP, LLC,
D/B/A MAJOR PHARMACEUTICALS, D/B/A
RUGBY LABORATORIES;
AMERISOURCEBERGEN DRUG
CORPORATION; H.D. SMITH WHOLESALE

DRUG COMPANY; H.D. SMITH, LLC MIAMI-
LUKEN, INC.; WAL-MART STORES EAST,
L.P., d/b/a WAL-MART PHARMACY
WAREHOUSE #1 and WAL-MART PHARMACY
WAREHOUSE #45; EXPRESS SCRIPTS
HOLDING COMPANY; EXPRESS SCRIPTS,
INC; CVS HEALTH CORP.; CAREMARK RX,
LLC; CAREMARKPCS HEALTH, LLC;
CAREMARK, LLC;  CAREMARK PCS, LLC;
UNITEDHEALTH GROUP INC.; OPTUM, INC.;
OPTUMRX, INC.; RITEAID CORP.; ENVISION
PHARMACEUTICAL SERVICES, LLC; and
MEDTRAK SERVICES, LLC

        Defendants.

## **COMPLAINT**

Plaintiff, the City of Springfield, Missouri, sues Defendants Purdue Pharma, L.P.; Purdue

Pharma, Inc.; The Purdue Frederick Company, Inc.; Teva Pharmaceutical Industries, LTD; Teva

Pharmaceuticals USA, Inc.; Cephalon, Inc.; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen

Pharmaceuticals, Inc.; Noramco, Inc.; Johnson & Johnson; Mallinckrodt plc; Mallinckrodt LLC;

Mallinckrodt Enterprises, LLC; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Insys

Therapeutics, Inc.; Insys Pharma, Inc.; Allergan plc; Actavis plc; Actavis, Inc.; Actavis LLC;

Actavis Pharma, Inc.; Watson Pharmaceuticals, Inc.; Watson Pharma, Inc.; Watson

Pharmaceuticals, Inc.; Watson Pharma, Inc.; Watson Laboratories, Inc.; McKesson Corporation;

Cardinal Health 5, LLC; Cardinal Health 100, Inc.; Cardinal Health 108, LLC; Cardinal Health

110, LLC; Cardinal Health 113, LLC; Cardinal Health 122, LLC; Cardinal Health 132, LLC;

Cardinal Health 200, LLC; Cardinal Health 201, LLC; Cardinal Health 414, LLC; and The Harvard

Drug Company, LLC, d/b/a Major Pharmaceuticals, d/b/a Rugby Laboratories;

AmerisourceBergen Drug Corporation; H.D. Smith Wholesale Drug Company; H.D. Smith, LLC;

Miami-Luken, Inc.; Wal-Mart Stores East, L.P., D/B/A Wal-Mart Pharmacy Warehouse #1 and

Wal-Mart Pharmacy Warehouse #45; Express Scripts Holding Company; Express Scripts, Inc; CVS Health Corp.; Caremark Rx, LLC; CaremarkPCS Health, LLC; Caremark, LLC; Caremark PCS, LLC; UnitedHealth Group Inc.; Optum, Inc.; OptumRx, Inc.; RiteAid Corp.; Envision Pharmaceutical Services, LLC; and Medtrak Services, LLC, and for causes of action states as follows:

## **INTRODUCTION**

1.     No town wants to be the epicenter of Neonatal Abstinence Syndrome ("NAS") affected babies.  No town wants to experience increases in opioid overdoses statistics, in number of users, and in need for counteractive Narcan, at present, when those trends should be reversing due to widespread recognition of the problem of opioid misuse and addiction.  No town wants to be a "destination" for opioid, heroin, and fentanyl traffickers.  Sadly, Springfield, Missouri houses more opioid-addicted infants that any city in the state and has experienced a swell in opioid-related harm as other cities have begun to witness at least some decrease in the negative statistics associated with opioid abuse.  Furthermore, the town has become "less a rest stop for opioid-trafficking cartels and more of a destination."[1]

2.     Prescription opiates are narcotic drugs. They are derived from or possess properties similar to opium and heroin and are categorized as "Schedule II" drugs due to their high potential for abuse and potential to cause severe psychological or physiological dependence.  The terms "opioids" and "opioid analgesics" describe the entire class of natural and synthetic opiates.

---

[1] Will Schmitt, *Stories of addiction highlight Springfield opioid summit*, SPRINGFIELD NEWS-LEADER (July 20, 2017) https://www.news-leader.com/story/news/politics/2017/07/21/stories-addiction-highlight-springfield-opioid-summit/489989001/

3.      The Food and Drug Administration ("FDA") originally approved opioid treatment for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care.[2]  Later, the label was stretched to reach treatment of patients with pain lasting more than three months, labeled "chronic pain."  Widespread opioid use followed.

4.      Within the last twenty years, a scourge infected this country in the form of a public health epidemic caused by widespread addiction to opioids like Oxycontin and Percocet, as well as generic forms of oxycodone and hydrocodone.  The scourge is popularly known as the "Opioid Epidemic."[3]

5.      Outside of the spotlight of St. Louis and Kansas City, Springfield has maintained a small-town-feel as a home to college students, innovators, educators, and professionals.  For many years, the prospect of a major drug problem infiltrating the borders of Greene County and landing in Springfield was inconceivable.  However, as is evident across a range of metrics, the Opioid Epidemic has taken root in Springfield.[4]

6.      First, prescribing and dispensing rates for Greene County are well above national and Missouri averages.  In 2010, the estimated rate of opioid prescriptions per 100 U.S. residents was 81.2.  The same rate per 100 persons in Missouri was 91.  The rate was a staggering 143.8 in Greene County.[5]  That rate has remained high in Greene County, at 108.9 in 2016, despite the national rate decreasing to just 66.5, and the Missouri rate improving to 80.4.[6]  In 2015, Greene

---

[2] Opioid was originally a term denoting synthetic narcotics resembling opiates but increasingly used to refer to both opiates and synthetic narcotics. Stedman's Medical Dictionary 27th Edition.
[3]     L.     Manchikanti    et al.,    *Opioid    Epidemic    in    the    United    States*,    available    at https://www.ncbi.nlm.nih.gov/pubmed/22786464.
[4] Springfield's Heroin Epidemic (Apr. 2017) https://www.417mag.com/issues/april-2017/heroin-hits-home/.
[5]     U.S.     Prescribing     Rate     Maps,     Centers     for     Disease     Control     and     Prevention, https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last accessed Apr. 9, 2018).
[6] *Id.*

County had approximately 70% more opioids prescribed per capita than the national average.

7.    Greene County also ranks high among counties nationwide with respect to the amount of opioids *dispensed* per capita, as measured in morphine-milligram equivalents ("MME").[7]

8.    Second, Springfield has seen an increase in opioid overdoses in recent years. Although opioid overdose death rates were the lowest in recent history in 2012, at 17.9 fatal overdoses per 100,000 people, these rates climbed to 31.6 per 100,000 in 2015.[8] The overdose rate for citizens under the age of fifty years is almost twice the national average.

9.    During the first six months of 2017, Springfield lost seven citizens to overdoses and officers seized 1,460.5 pounds of heroin.[9] Greene County lost twenty-two people in the first nine months of 2017 from prescription opioid overdoses alone, and twenty-three more from illicit fentanyl and heroin overdoses.[10]

10.    Third, the ill-effects of opioid addiction and abuse have reached far beyond immediate users. For example, the number of babies born in Springfield with NAS, induced specifically by prenatal opioid use, has skyrocketed. Over 1,200 babies were born with NAS in Missouri in 2015 and 2016.[11] Cox Hospital in Springfield fills at least one of its twenty-eight

---

[7] Per the CDC, "The amount of milligrams of morphine an opioid dose is equal to when prescribed. This is how to calculate the total amount of opioids, accounting for differences in opioid drug type and strength."
[8] Opioid Crisis in Greene County, https://www.springfieldmo.gov/3605/Opioids-in-Greene-County (last accessed Mar. 29, 2018).
[9] The opioid epidemic in Greene County: How has our community been impacted? (Jan. 15, 2018) http://www.the-standard.org/life/the-opioid-epidemic-in-greene-county-how-has-our-community/article_a7d0c7b6-fa61-11e7-94bc-b7faf9a97ed0.html.
[10] Our Voice: Fentanyl raises stakes in opioid battle (Dec. 11, 2017) https://www.news-leader.com/story/opinion/editorials/2017/12/11/our-voice-fentanyl-raises-stakes-opioid-battle/941568001/.
[11] Missouri neonatal abstinence syndrome diagnoses quintuple (Dec. 27, 2016) http://krcgtv.com/news/local/missouri-neonatal-abstinence-syndrome-diagnoses-quintuple.

Neonatal Intensive Care Unit rooms with an addicted baby each day.[12]

11.     The Opioid Epidemic did not come to Springfield by chance.  Like other cities in America, Springfield fell victim to pharmaceutical manufacturers, wholesaler/distributors, and pharmacy benefit managers (PBMs) that saturated the city with excessive amounts of dangerous and addictive prescription opioids under the guise of lawful and beneficial activity.

12.     The Opioid Epidemic is immediately traceable to the highly deceptive and unfair marketing campaigns employed by Manufacturer Defendants, designed to persuade physicians using misleading marketing materials, rather than scientific facts, to foster a culture of opioid use in unsuspecting patients.

13.     Manufacturer Defendants overstated opioids' efficacy and understated their addictive properties.  Intent on driving up profits by selling more and more, Manufacturer Defendants' marketing strategies included encouraging physicians to increase dose amounts and frequencies over time to keep up with patients' increased tolerance, while never providing education regarding the risk of addiction rates or on patient weaning.

14.     Manufacturer and Distributor Defendants knew of the dangerously addictive qualities and high rates of loss and misappropriation ("diversion rates") of their drugs and failed to appropriately educate the public and prescribers of those dangers.

15.     Distributor Defendants, as deliverers of opioids through a sophisticated closed distribution system described herein, had a duty to forestall and report diversion.  Distributor Defendants disregarded their own real-time data and failed to report and/or halt red-flagged, facially suspicious orders from pharmacies.

---

[12]     Ozarks Sees a Growing Number of Opiate Addicted Newborns (Nov. 16, 2015) http://www.ozarksfirst.com/news/ozarks-sees-a-growing-number-of-opiate-addicted-newborns/270941582.

16.     As an extension of these efforts, PBM Defendants authorized patient use of opioids to the exclusion of other, less dangerous treatments, resulting in the overuse and abuse of opioids and an addiction culture.  The PBMs, through their use of formularies and other tools, controlled which drugs were covered and paid for by private or public insurers, and promoted the Opioid Epidemic by authorizing reimbursement for opioids for pain relief where they were not necessary or the risks of opioid use outweighed the benefits.

17.     PBM Defendants serve as gatekeepers to the vast majority of opioid prescriptions filled in the United States, including Springfield, often serving in the gatekeeper role before the prescription is even written.  PBMs require and receive financial incentives from Manufacturer Defendants to keep certain drugs on and off formularies, for giving certain drugs preferred formulary placement, and for limiting or avoiding pre-authorization requirements for certain drugs, all of which result in greater utilization and greater profits for the manufacturer.  This system led to more opioid prescriptions and more pills available to the general public.

18.     PBMs have the power and ability to limit the number of opioids available for legitimate and illegitimate consumption.  Their fingerprints are on nearly every opioid prescription filled, and they profit in myriad ways on every pill.  Even though PBMs were well aware of the effect of their decisions about formulary placement, they chose to make decisions purely for their own financial gain.

19.     Each Defendant profited enormously from the movement of opioid products through Springfield.  Each incentivizes the promotion and utilization of opioid drugs instead of other treatment options.  Defendants created these incentives and share in their perversity, usually without disclosure to those who reasonably rely on Defendants to abide by their federal, state, and common law duties.  Some of these incentives – such as those promoting growing sales of opioids

– conflict with laws requiring that orders and shipments be monitored to ensure that opioids are not diverted. Defendants chose self-interest and profit maximization over compliance with their respective, non-delegable duties.

20.     Each Defendant contributed to a public nuisance of historic proportions by flooding Springfield with excessive amounts of dangerous and addictive medications. Defendants' actions are a serious breach of the public trust, which has resulted in drug misuse and abuse, addiction, and deaths, and great expenses for Springfield, a first responder to the Opioid Epidemic.

21.     The costs to Springfield include significant increases in expenditures on emergency services, including responding to the overdose calls and crime reports that are the natural product of increased drug abuse. For example, the city was forced to add twenty-one police officers to its force and is seeking a grant to add seven new firefighters. The need for an additional fire station has also been documented.

22.     Additionally, with the State of Missouri making no meaningful progress on the subject, Springfield was forced to begin participation in a Prescription Drug Monitoring Program to assist in curbing opioid abuse in the area. The Prescription Drug Monitoring Program will enable prescribers and pharmacists to determine which patients are receiving amounts of opioid medication that indicates diversion, rather than legitimate medical need and use. This will be the first time that prescribers and pharmacists in Springfield will be given comprehensive information that may reveal drug-seeking behavior by opioid-addicted patients.

23.     Other costs to Springfield include funding health insurance; providing medical treatment; investigating and prosecuting drug-related crimes; incarcerating perpetrators; supervising and rehabilitating the addicted; preventing, investigating, and treating overdoses; and tending to the infirm, dying, and dead.

24.     The costs created by Defendants' actions must ultimately be borne by Defendants themselves, rather than Springfield taxpayers.  This action is therefore brought to expose the Defendants' misdeeds, curb the proliferation of opioids, recoup the expenses and penalties owed, recover the damages suffered by Springfield, and perhaps most importantly, to abate the continuing public nuisance caused by the actions of Defendants and force them to help fund and solve the problem they created.

## PARTIES

### I.     PLAINTIFF

25.     Few cities boast the American charm of Springfield, the birth place of Route 66.  It houses the headquarters for multiple nationwide brands, like Bass Pro Shops and O'Reilly Auto Parts, a large state university, Missouri State University, and smaller universities Drury University and Evangel University.  Due to the universities, Springfield is home to approximately 23,500 young adults during the fall and spring semesters.  Springfield is also home to many graduates who chose to stay and join the vibrant and innovative young community after attending school.

26.     The metropolitan area of Springfield frequently fills with attendees of art festivals and ballet productions.  Springfield has poured substantial resources into the revitalization of its downtown.  These goals have been realized with considerable tourism activity, including three million overnight visitors annually.

27.     The collective actions of Defendants have caused and will continue to cause Springfield to expend substantial sums of public funds to deal with the significant consequences of the Opioid Epidemic and resulting public nuisance that was created by Defendants' illegal, reckless, and malicious actions.  Specifically, Defendants flooded the city with highly addictive prescription medications without regard for the adverse consequences to Springfield or its citizens.

28. Plaintiff has standing to recover the damages incurred as a result of Defendants' acts and omissions. Plaintiff has standing to bring all claims pled herein, including those brought under the federal RICO statute, pursuant to 18 U.S.C. §§ 1961(3) and 1964.

## II. MANUFACTURER DEFENDANTS

29. Each Manufacturer Defendant listed below manufactured, packaged, sold, placed into the stream of commerce, labeled, marketed, advertised, and promoted prescription opioid drugs. Upon information and belief, each Manufacturer Defendant and its affiliates were registered to do business in the State of Missouri and did, in fact, do business in the State of Missouri during the relevant time period. Upon information and belief, the prescription opioid drugs manufactured by each Manufacturer Defendant were sold and consumed in Springfield during the relevant time period.

30. Manufacturer Defendants are "registrants" under the federal Controlled Substances Act ("CSA"). 21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the Drug Enforcement Administration ("DEA") under 21 U.S.C. § 823. Section 823(a), in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

31. Missouri law mandates that all out-of-state drug distributors that are drug manufacturers seek registration with the Board of Pharmacy. 20 CSR 2220-5.050(4), *see also* Mo. Stat. §§ 338.075, 338.337, 338.347. Upon information and belief, each Manufacturer Defendant maintained the appropriate registration for the manufacture of controlled substances pursuant to Missouri law, and conducted business within Springfield.

### A. Purdue Defendants

32. Purdue Pharma, L.P., is a limited partnership organized under Delaware law with its principal place of business in Stamford, Connecticut. Purdue Pharma, L.P., is registered to do

business in Missouri; its registered agent for service of process is Corporation Service Company, 209 West Washington Street, Charleston, Missouri 63834. Purdue Pharma, Inc., is a New York Corporation with its principal place of business in Stamford, Connecticut. Purdue Pharma, L.P., Purdue Pharma, Inc., and The Purdue Frederick Company, Inc., are hereinafter collectively referred to as "Purdue."

33.     Purdue engaged in manufacture, promotion, and sale of the opioids referenced in this Complaint, including the following:

     a.  OxyContin, a Schedule II[13] opioid drug;

     b.  MS Contin, a Schedule II opioid drug;

     c.  Dilaudid, a Schedule II opioid drug;

     d.  Dilaudid-HP, a Schedule II opioid drug;

     e.  Butrans, a Schedule III opioid drug;

     f.  Hysingla ER, a Schedule II opioid drug; and

     g.  Targini.

34.     Purdue's national annual sales of OxyContin alone were almost $3 billion in 2009, up from 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for painkiller drugs.

    B.  <u>Cephalon Defendants</u>

35.     Defendant Teva Pharmaceuticals USA, Inc., is a Delaware corporation with its principal place of business in North Whales, Pennsylvania. Teva Pharmaceuticals USA is registered to do business in Missouri; its registered agent is Corporate Creations Network, Inc., 12747 Olive Boulevard #300, St. Louis, Missouri 63141. Teva Pharmaceuticals USA is a wholly

---

[13] As scheduled by the DEA.

owned subsidiary of Teva Pharmaceutical Industries, Ltd., an Israeli corporation. Collectively, these entities are referred to as "Teva."

36.     Defendant Cephalon, Inc., is a Delaware corporation operating its principal place of business in Frazer, Pennsylvania.  In 2011, Teva Pharmaceutical Industries, Ltd., acquired Cephalon, Inc.

37.     Teva Pharmaceuticals USA and Cephalon, Inc., work closely to market, manufacture, sell, and distribute Cephalon products, Schedule II opioid drugs Actiq and Fentora, in the United States.  Teva Pharmaceuticals USA, Inc., markets these drugs as Teva products and sells all former Cephalon branded products through its "specialty medicines" division.

C.     Janssen Defendants

38.     Janssen Pharmaceuticals, Inc., f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc., f/k/a Janssen Pharmaceutica, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.  Janssen is registered to do business in the state of Missouri, with its registered agent as CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105. It is a wholly-owned subsidiary of Johnson & Johnson, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.  In addition, Noramco, Inc., was a wholly owned subsidiary of Johnson & Johnson, until July, 2016. Noramco, Inc., is incorporated in Delaware and has its principal place of business in Wilmington, Delaware.

39.     Johnson & Johnson controls the sale and development of Janssen products and corresponds with the FDA regarding Janssen products.

40.     Janssen developed, marketed, and sold Schedule II opioid drugs Nucynta and Nucynta ER until 2015, with 2014 sales of $172 million.  Additionally, Janssen manufactured, promoted, sold, and distributed Duragesic, a Schedule II opioid drug.

41.     Upon information and belief, Janssen was registered to do business in the state of Missouri and marketed and sold Nucynta and Nucynta ER in Missouri and Springfield during the relevant time period.

D.     Endo Defendants

42.     Endo Health Solutions, Inc., and its wholly owned subsidiary Endo Pharmaceuticals, Inc., are Delaware corporations with principal places of business in Malvern, Pennsylvania.  Endo Pharmaceuticals, Inc., is registered to do business in Missouri; its registered agent is the Secretary of State, 600 West Main, Jefferson City, Missouri 65102.  These entities are referred to collectively as "Endo."

43.     Endo develops, markets, and sells Schedule II opioid drugs Opana and Opana ER, Percodan, and Percocet.

44.     The opioids sold by Endo contributed to $403 million of Endo's $3 billion in revenue in 2012.  Opana ER alone accounted for $1.15 billion total for the years 2010 through 2013.

45.     Endo also manufactures and sells generic opioids including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

E.     Insys Therapeutics, Inc., Defendant

46.     Insys Therapeutics, Inc., ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona.  Insys Pharma, Inc., a wholly owned subsidiary of Insys

Therapeutics, Inc., is registered to do business in Missouri, with the registered agent CT Corporation System, 120 South Central Ave, Clayton, Missouri 63105.

47.     Insys manufactured and sold the highly addictive opioid prescription drug Subsys.

F.     Actavis Defendants

48.     Allergan plc is incorporated in Ireland with its principal place of business in Dublin, Ireland.  By way of history, Watson Laboratories, Inc., a Nevada corporation with its principal place of business in Corona, California, acquired Actavis, Inc. in October, 2012.  The name changed to Actavis, Inc., then Actavis plc in October, 2013. Actavis plc acquired Allergan plc in March, 2015.  The acquisition resulted in another name change to Allergan plc.

49.     Actavis, LLC, is a Delaware corporation with its principal place of business in Parsippany, New Jersey.

50.     Actavis Pharma, Inc., formerly Actavis, Inc., and Watson Pharma, Inc., is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Actavis Pharma, Inc., is licensed to do business in Missouri, with the registered agent Corporate Creations Network, Inc., 12747 Olive Boulevard #300, St. Louis, Missouri 63141.

51.     Actavis plc, Actavis, Inc., Actavis, LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc., are owned by Allergan plc (collectively "Actavis").

52.     The drugs marketed and sold by Actavis include Schedule II drugs Kadian and Norco (generic Kadian), and generic versions of Duragesic and Opana (previously discussed).

G.     Mallinckrodt Defendants

53.     Mallinckrodt plc is an Irish public limited company headquartered in the United Kingdom, with its United States headquarters in St. Louis, Missouri.  Mallinckrodt Enterprises,

LLC, formerly Mallinckrodt, LLC, is incorporated in Delaware with its principal place of business in New Mexico. Mallinckrodt, LLC, is registered to do business in the State of Missouri with its registered agent as CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.

54.     Mallinckrodt manufactures, markets, sells, and distributes generic forms of hydrocodone and oxycodone.

55.     Mallinckrodt was the subject of a prior investigation and settlement regarding the failure to detect and notify the DEA of suspicious orders of controlled substances.

## III.    DISTRIBUTOR DEFENDANTS

56.     Each Distributor Defendant identified herein distributed, supplied, sold, marketed, advertised, and placed into the stream of commerce prescription opioid drugs. Each Distributor Defendant was engaged in the "distribution" or "wholesale" transactions involving opioid drugs.

57.     Distributor Defendants are "registrants" under the federal CSA. 21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823(b), in turn, requires distributors of Schedule II controlled substances to register with the DEA.

58.     Missouri law mandates that all wholesale drug distributors, as defined in Missouri Statutes § 338.330(4), seek licensure with the Board of Pharmacy. 20 CSR 2220-5.020(4). *See also* Mo. Stat. §§ 338.075, 338.337, 338.347. Upon information and belief, each Distributor Defendant maintained an appropriate registration for the manufacture of controlled substances pursuant to Missouri law and conducted business within Springfield.

### A.    McKesson Corporation Defendant

59.     McKesson Corporation ("McKesson") is a Delaware Corporation with

Case 6:18-cv-03167-SRB    Document 1    Filed 05/30/18    Page 15 of 92

headquarters in California that is registered to do business in Missouri, with the registered agent CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101.

60.     Among its many business interests, McKesson distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments.

61.     McKesson is the largest pharmaceutical distributor in North America.  McKesson delivers approximately one third of all pharmaceuticals used in North America.

B. Cardinal Health Defendants

62.     Defendants Cardinal Health 5, LLC; Cardinal Health 100, Inc.; Cardinal Health 110, LLC; Cardinal Health 108, LLC; Cardinal Health 113, LLC; Cardinal Health 122, LLC; Cardinal Health 132, LLC; Cardinal Health 200, LLC; Cardinal Health 201, LLC; and Cardinal Health 414, LLC, are for-profit Ohio Corporations registered to do business in Missouri.  Their principal place of business is 7000 Cardinal Place, Dublin, Ohio 43017.  Each party's registered agent is CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.

63.     The Harvard Drug Group, LLC, d/b/a Major Pharmaceuticals, d/b/a Rugby Laboratories is a for-profit corporation registered to do business in Missouri.  The principal place of business for The Harvard Drug Group, LLC, d/b/a Major Pharmaceuticals, d/b/a Rugby Laboratories is 31778 Enterprise Drive, Livonia, Michigan; its registered agent is CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.  The Harvard Drug Company, LLC, became a subsidiary of Cardinal Health, Inc., in 2015.

64.     These Defendants are referred to collectively herein as "Defendant Cardinal."

65.    Specifically, Defendant Cardinal distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments. Cardinal is the third largest pharmaceutical distributor in North America.

C.    AmerisourceBergen Defendants

66.    Defendant AmerisourceBergen Drug Corporation ("AmerisourceBergen") is a Delaware Corporation with its principal place of business in Chesterbrook, Pennsylvania. It is registered to do business with the Missouri Secretary of State; its registered agent is CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.

67.    Specifically, Defendant AmerisourceBergen distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments. AmerisourceBergen is the second largest pharmaceutical distributor in North America; along with McKesson Corporation and Cardinal Health, AmerisourceBergen is a "Big Three" distributor.

68.    Defendants H.D. Smith Wholesale Drug Company and H.D. Smith, LLC, (collectively "H.D. Smith") have principal places of business in Springfield, Illinois. H.D. Smith Wholesale Drug Company was registered to do business in Missouri but became inactive as of 2014. Subsequently, in 2014, H.D. Smith, LLC, registered to do business in Missouri; its registered agent is CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.

69.    Upon information and belief, H.D. Smith participated in pharmaceutical distribution within Missouri during the relevant time period. The H.D. Smith website specifies that the entity is a wholesale distributor for "independent pharmacies."

70. Defendant AmerisourceBergen Drug Corporation acquired H.D. Smith in a late 2017, early 2018 transaction.[14]

D. <u>Miami-Luken, Inc. Defendant</u>

71. Miami-Luken, Inc. ("Miami-Luken") is an Ohio corporation with its principal place of business in Springboro, Ohio.

72. Upon information and belief, Miami-Luken distributed opioid drugs in Missouri and Springfield. Miami-Luken primarily distributed the highly addictive opioid drugs hydrocodone and oxycodone.

73. Miami-Luken faces scrutiny due to surreptitious opioid distribution practices in states like Missouri and failure to report suspicious orders in communities like Springfield.

E. <u>Wal-Mart Stores East, L.P. d/b/a Wal-Mart Pharmacy Warehouse #46 and Wal-Mart Pharmacy Warehouse #45</u>

74. Wal-Mart Stores East, L.P., is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Wal-Mart Stores East, L.P., is registered to do business in the State of Missouri, with the registered agent CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.

75. Upon information and belief, Wal-Mart Stores East, L.P., acted as a distributor under the names Wal-Mart Pharmacy Warehouse #1 and Wal-Mart Pharmacy Warehouse #45 ("Wal-Mart") in Missouri and, specifically, Springfield, during the relevant time period.

76. Collectively, the above-referenced opioid drug distributors are referred to as "Distributor Defendants."

---

[14] AmerisourceBergen Completes Acquisition of HD Smith (Jan. 3, 2018)
https://www.amerisourcebergen.com/abcnew/newsroom/press-releases/amerisourcebergen-completes-acquisition-of-hd-smith.

## IV. PHARMACY BENEFIT MANAGER DEFENDANTS

77.     The Pharmacy Benefit Manager Defendants ("PBM Defendants") are defined below.  At all relevant times, the PBM Defendants acted as gatekeepers of prescription drugs, including opioids by negotiating with drug manufacturers to offer preferred drug formulary placement for the manufacturers' drugs and establishing reimbursement rates for the drugs dispensed.  PBMs earn revenue from at least the following sources: fees from health plans and insurers; fees from drug manufacturers, including fees related to formulary creation and drug placement and rebates and other incentives, such as volume target bonuses; and fees from maintaining pharmacy networks.[15]

### A. Express Scripts Defendants

78.     Express Scripts Holding Company ("ESHC") is a Delaware Corporation with its principal place of business in St. Louis, Missouri.  ESHC may be served through its registered agent: Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 221 Boliver Street, Jefferson City, Missouri 65101.

79.     Express Scripts, Inc. ("ESI"), is a Delaware Corporation with its principal place of business in St. Louis, Missouri.  ESI is a pharmacy benefit management company and is a wholly-owned subsidiary of ESHC.

80.     In 2012, ESI acquired its rival, Medco Health Solutions, Inc., in a $29.1 billion deal.  As a result of the merger, ESHC was formed and became, at the time, the largest PBM in

---

[15] Health Policy Brief, *On behalf of payers, pharmacy benefit managers negotiate rebates from drug makers in exchange for preferred formulary placement*, HEALTH AFFS., Sept. 14, 2017, https://www.healthaffairs.org/do/10.1377/hpb20171409.000178/full/ (hereinafter "Health Policy Brief").

Case 6:18-cv-03167-SRB   Document 1   Filed 05/30/18   Page 19 of 92

the nation, filing a combined 1.4 billion prescriptions for employers and insurers.[16]  These parties are collectively referred to as "Express Scripts."

81.     According to the Pharmacy Benefit Management Institute, in 2017, Express Scripts was the second ranking PBM nationwide with 24% of the industry market share.[17]

82.     At all times relevant hereto, Express Scripts offered pharmacy benefit management services, including mail order pharmacy services, nationwide and maintained a national formulary or formularies that are used nationwide, including in Springfield.  This includes serving as PBM for the City of Springfield from 2008 through 2013.  At all times relevant hereto, those formularies included opioids, including those at issue in this case.  At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Springfield.

83.     At all relevant times hereto, Express Scripts did substantial business providing pharmacy benefits, including authorizing claims for reimbursement, in Springfield.

    B.  CVS Health and Caremark Defendants

84.     CVS Health Corporation ("CVS Health"), formerly known as CVS Caremark Corporation, is a Delaware corporation with its principal place of business located in Woonsocket, Rhode Island.  CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

85.     Caremark Rx, LLC, is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.  On information and belief, CVS Health is the direct parent company of Caremark Rx, LLC.  According to CVS Health's 2016 Annual Report,

---

[16] Peter Frost, *Express Scripts closes $29.1-billion purchase of Medco*, L.A. TIMES, Apr. 3, 2012, http://articles.latimes.com/2012/apr/03/business/la-fi-medco-20120403.

[17] *Industry Research: PBM Market Share*, Pharm. Benefit Mgmt. Inst., https://www.pbmi.com/PBMI/Research/Industry_Research/PBMI/Research/PBMI___Industry_Research.aspx?hkey =22023612-80c4-4ada-a17e-85e7dfcbc1f8 (last visited Mar. 23, 2018).

Defendant Caremark Rx, LLC, is "the parent of [CVS Health]'s pharmacy services subsidiaries, is the immediate or indirect parent of many mail order, pharmacy benefit management, infusion, Medicare Part D, insurance, specialty mail and retail specialty pharmacy subsidiaries, all of which operate in the United States and its territories." Caremark Rx, LLC, may be served through its registered agent: The Corporation Trust company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

86.     CaremarkPCS Health, LLC, is a Delaware limited liability company doing business as CVS/Caremark and CVS Caremark and whose principal place of business is at the same location as CVS Health. On information and belief, CVS Health is the indirect parent of CaremarkPCS Health, LLC.

87.     Caremark, LLC, is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark PCS, LLC, is a Delaware limited liability company formerly known as AdvancePCS, Inc., which was founded in 1996 and is based in Irving, Texas. On information and belief, Caremark Rx, LLC, is the sole member of both Caremark, LLC, and Caremark PCS, LLC.

88.     Defendants Caremark Rx, LLC, CaremarkPCS Health, LLC, Caremark, LLC, and Caremark PCS, LLC, are collectively referred to as "Caremark."

89.     CVS Health describes itself in a September 3, 2014, press release as a "pharmacy innovation company helping people on their path to better health. Through our 7,700 retail pharmacies, 900 walk-in medical clinics, a leading pharmacy benefits manager with nearly 65 million plan members, and expanding specialty pharmacy services, we enable people business and communities to manage health in more affordable, effective ways. This unique integrated model

increases access to care, delivers better health outcomes and lowers overall health care costs."[18] In 2016, CVS Health reported an operating income of $10 billion.

90.     In the above-referenced September 3, 2014, press release CVS Health announced its change of name from CVS Caremark Corporation to CVS Health. CVS Health explained that it was changing its name "to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health."[19]  CVS Health explained that the newly-named company included "its pharmacy benefit management business, which is known as CVS/Caremark."[20]  In that same press release, CVS Health touted, "[f]or our patients and customers, *health is everything* and…we are advising on prescriptions [and]helping manage chronic and specialty conditions."[21]

91.     According to the Pharmacy Benefit Management Institute, CVS Health (Caremark) was the highest ranking PBM in 2017 with 25% of the industry market share.[22]

92.     At all times relevant hereto, CVS Health and Caremark offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide, including in Springfield.  At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Springfield.

93.     At all times relevant hereto, CVS Health, through Caremark, derived substantial revenue providing pharmacy benefits, including authorizing claims for reimbursement, in Springfield.

---

[18] Press Release, CVS Caremark Announces Corporate Name Change to CVS Health to Reflect Broader Health Care Commitment, CVSHealth (Sept. 3, 2014), https://cvshealth.com/newsroom/press-releases/cvs-caremark-announces-corporate-name-change-cvs-health-reflect-broader.
[19] *Id*.
[20] *Id*.
[21] *Id*. (emphasis added).
[22] Pharm. Benefit Mgmt. Inst., *supra*.

C. OptumRx Defendants

94.    UnitedHealth Group Incorporated ("United Health") is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.  It is a diversified managed health care company with two business platforms.  UnitedHealth serves approximately 115 million individuals throughout the United States.  For 2016, UnitedHealth reported an operating income of $12.9 billion.

95.    Optum, Inc., is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Optum, Inc., is a health services company managing the subsidiaries that administer UnitedHealth's pharmacy benefits, including OptumRx, Inc., On information and belief, Optum, Inc., is a subsidiary of UnitedHealth.

96.    OptumRx, Inc., ("OptumRx") is a Delaware corporation with its principal place of business in Irvine, California.  Optum Rx operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of Optum, Inc.,  OptumRx operates as the PBM for UnitedHealth.

97.    UnitedHealth and Optum, Inc. may be served through their registered agent: CT Corporation System, Inc., 1010 Dale Street North, St. Paul, Minnesota 55117.

98.    According to the Pharmacy Benefit Management Institute, OptumRx (UnitedHealth) was the third highest ranking PBM in 2017 with 22% of the industry market share.[23]

99.    At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide, including in Springfield.  At all times relevant hereto, those formularies included opioids,

---

[23] Pharm. Benefit Mgmt. Inst., *supra*.

including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Springfield.

100. At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits, including authorizing claims for reimbursement, in Springfield.

F. Rite Aid Defendants

101. RiteAid Corp. is a Delaware corporation with its principal place of business at 30 Hunter Lane, Camp Hill, Pennsylvania, 17011. Rite Aid is the third largest retail drugstore chain in the United States based on both revenues and number of stores.

102. Envision Pharmaceutical Services, LLC ("EnvisionRx" or "EnvisionRxOptions") is an Ohio limited liability corporation with its principal place of business in Twinsburg, Ohio. EnvisionRx operates a national, full-service PBM company that offers a broad range of pharmacy-related services. Rite Aid Corp. acquired EnvisionRx on June 24, 2015. EnvisionRxOptions now exists as a 100 percent owned subsidiary of Rite Aid.

103. MedTrak Services, LLC, ("MedTrak") is a Delaware limited liability corporation, with its principal place of business in Overland Park, Kansas. As of September 8, 2014, MedTrak Services, LLC, was purchased by Envision Pharmaceutical Holdings, Inc., a Delaware Corporation with its principal place of business in Twinsburg, Ohio, and the former parent company of "Envision Rx." Both MedTrak Services, LLC, and Envision Pharmaceutical Holdings, Inc., are now subsidiaries of Rite Aid.

104. EnvisionRx currently provides both transparent and traditional PBM options through its EnvisionRxOptions and MedTrak PBMs, respectively. MedTrak, the "traditional"

option, is described as a "spread-based PBM[.]"[24]  In contrast, EnvisionRxOptions "promotes a transparent, pass-through business model in which 100% of earned rebates, discounts, and incentives are instantly credited at the point of sale to customers[.]"[25]

105.    At all times relevant hereto, MedTrak offered pharmacy benefit management services, including mail order pharmacy services, nationwide.  This includes serving as PBM for the City of Springfield since 2014.  At all times relevant hereto, MedTrak's formularies included opioids, including those at issue in this case.  At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Springfield.

106.    At all relevant times hereto, MedTrak did substantial business providing pharmacy benefits, including authorizing claims for reimbursement, in Springfield.

107.    The opioids at issue in this case were authorized for reimbursement by PBM Defendants.  Without the PBM Defendant's authorization of the opioids at issue herein, the opioids would not have entered the marketplace and the entire scheme would have failed.

## JURISDICTION AND VENUE

108.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on the federal claims asserted herein.  This Court may exercise supplemental jurisdiction over the state law claims included herein under 28 U.S.C. § 1367 as they arise from the same case or controversy as the federal claims.

---

[24]  Press Release, Rite Aid to Acquire Leading Independent Pharmacy Benefit Manager EnvisionRx for $2 Billion (Feb. 11, 2015),
https://www.riteaid.com/corporate/news?p_p_id=riteaidpressreleases_WAR_riteaidpressreleasesportlet&p_p_lifecy cle=0&p_p_state=normal&p_p_mode=view&p_p_col_id=column-3&p_p_col_pos=2&p_p_col_count=3&_riteaidpressreleases_WAR_riteaidpressreleasesportlet_action=getNewsRoo mDetail&itemNumber=1845.
[25] *Id.*

109.    This Court also has jurisdiction under 28 U.S.C. § 1332, as Plaintiff is a "citizen" of this State, while Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of costs and interest.

110.    Venue is proper pursuant to 28 U.S.C. § 1391.

111.    This Court has personal jurisdiction over each Defendant as each purposefully availed itself of the privilege of exploiting forum-based business opportunities. Defendants deliberately and regularly transact or transacted business in Springfield, Missouri, and Plaintiff's causes of action arose in Springfield, Missouri.

## FACTUAL BACKGROUND

112.    Springfield, with a population of approximately 167,000, is a city with a rich history, proud of its people, and committed to creating and preserving the American way of life for its residents. Defendants' scheme occurred in Springfield, Missouri, during the years 2006 through 2016.

113.    The scheme involved acts and omissions on behalf of each Defendant to promote opioid use and inevitable overuse and abuse across the country, including in Springfield. In a concerted effort to expand the market for opioids, Manufacturer Defendants falsely marketed the benefits and minimized the risks associated with opioid use. Meanwhile, Distributor Defendants distributed unreasonably high quantities of opioids to pharmacies throughout the state. The PBM Defendants authorized the vast majority of filled opioid prescriptions for reimbursement by public and private payors.

114.    The scheme could not have worked without each Defendant playing their respective part or, at a minimum, remaining silent about the absurd volume of drugs which they were collectively pushing into Springfield.

115.    What resulted from the success of Defendants' scheme was more than a marginal amount of excess medication.  The resulting damage to Springfield has been devastating.  The problems Springfield, its residents and visitors, its businesses and schools, its police and courts, now face were caused by the Defendants' reckless conduct.

## I.    OPIOIDS GENERALLY

116.    Opioids were originally limited to short-term use (not longer than ninety days), and in managed settings (e.g., hospitals), where the risk of addiction and other adverse outcomes was limited, for medical conditions such as post-surgical pain, trauma pain, and palliative care, for which opioids were sometimes effective.  Only after deliberate interference by Manufacturer Defendants into the professional judgment of physicians through aggressive marketing techniques did physicians consider opioids to be an acceptable long-term treatment for chronic pain.

117.    The prescription, dispensing, and reimbursement of opioids begins with the federally registered manufacturer of an FDA approved Schedule I controlled substance, *see* 21 U.S.C. § 823(a), and "educating" a physician on the usefulness of the drug.  The next step involves the physician, licensed by their state Board of Medicine, writing a prescription for the drug.  The patient, with valid prescription in hand, seeks out a pharmacy to fill the order.  The PBM must then approve the drug for dispensing under the patient's insurance.  The pharmacy must also be licensed by the State Board of Pharmacy and DEA to dispense controlled substances.

118.    Opioids are ultimately dispensed to the consumer by a pharmacy.  Opioids arrive to pharmacies through a distribution channel made up of state and federally regulated distributors.  These distributors are responsible to ensure that the orders they fill for pharmacy and hospital customers are not facially suspicious, as defined by the DEA in conjunction with the distributor.

119.    Patients' wellbeing requires an open, honest, transparent communication of the risk

and benefits of drugs between the manufacturer and prescriber, and among the prescriber, pharmacist, and patient together. The Opioid Epidemic is an example of what occurs when the parties responsible for highly dangerous and addictive pharmaceutical products allow greed to interfere with their legal duties.

      A. <u>Opioids as Addictive Substances Subject to Tolerance Increases</u>

120.     Any belief that long-acting opioids, such as OxyContin, would not prompt abuse and addiction was never grounded in science and has been conclusively discredited. In response to a 2013 physician-led petition to restrict the labels of long-acting opioid products, the FDA acknowledged "grave risks" associated with opioids including "addiction, overdose, and even death."

121.     A principal risk of long-term opioid use is that effectiveness wanes and patient tolerance increases such that the dose necessary to reach previously obtained analgesic relief can become "frighteningly high."[26] Where a patient reaches such doses, the risk and severity of withdrawal symptoms increases as well, leaving each patient at a higher risk of abuse, addiction, and progression to illegal drug use. Users become convinced that the drug is "needed to stay alive."[27]

122.     Still, use for even a few weeks results in withdrawal symptoms when the opioid is discontinued, including severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, and delirium. These withdrawal symptoms may last months, depending on the duration of opioid use.

---

[26] M. Katz, Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith, 170(16) Archives of Internal Med. 1422 (2010).
[27] David Montero, *Actor's Death Sows Doubt Among O.C.'s Recovering Opioid Addicts*, The Orange Cnty. Reg. (Feb 3, 2014), https://www.ocregister.com/2014/02/04/actors-death-sows-doubt-among-ocs-recovering-opioid-addicts/ (accessed Dec. 20, 2017).

123.     In addition, patient tolerance to opioids' analgesic actions, which requires higher doses of drugs to have the same effect, rises at a faster rate than patient tolerance to the respiratory depressive effects of opioids.  Thus, increasing dose amounts and/or frequency to match tolerance of analgesic effect can lead to overdose and death even when opioids are taken as directed.

124.     In fact, all labels of Schedule II long-acting opioids must include the warning that the drug "exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death."  The FDA now requires extended release and long-acting opioids to adopt "Risk Evaluation Mitigation Strateg[ies]" because the drugs present a "serious public health crisis of addiction, overdose, and death."

125.     The FDA thereby confirmed the line of thinking that pre-dated the Manufacturer Defendants' marketing scheme: due to their risks, opioids should be used "only when alternative treatments are inadequate."

126.      Indeed, the FDA expressly recognized that no long-term studies demonstrate the safety and efficacy of opioids for long-term use.

127.     Because of their addictive effect, Dr. Robert DuPont, former director of the National Institute on Drug Abuse and the former White House drug czar, stated in 2011 that opioids are more destructive than crack cocaine:

> [Opioid abuse] is building more slowly, but it's much larger. And the potential[] for death, in particular, [is] way beyond anything we saw then. . . .  [F]or pain medicine, a one-day dose can be sold on the black market for $100.  And a single dose can [be] lethal to a non-patient.  There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem.[28]

---

[28] Transcript, Use and Abuse of Prescription Painkillers, The Diane Rehm Show (Apr. 21, 2011), http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/transcript.

B.  Opioids as Causing Significant, Non-Addiction Related Side Effects

128.    Opioid use comes with additional negative side effects not related to addiction.

129.    Defendant Endo's research shows that opioid patients report higher rates of obesity, insomnia, and self-described fair or poor health compared to patients taking other prescription pain medication.

130.    Other studies have found opioids inefficient in treating migraine pain, and associated with sleepiness, confusion, increase in frequency of headaches, and increase in depression susceptibility

131.    Increased opioid use is also associated with an increased likelihood of other mental health conditions such as anxiety, and psychological distress; healthcare utilization, and a general decrease in health and wellness.

C.  Opioids as a Gateway to Heroin Use

132.    Heroin produces a very similar high to prescription opioids but is often less expensive.  While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price.

133.    Because of the disparate cost of heroin versus opioids and their similar effect, opioid abuse has triggered a resurgence in heroin use.  According to one national-level study, nearly 80% of heroin users reported that they used prescription opioids prior to heroin.  Similar rates apply even to our nation's youth: a 2015 report out of New York University found that three-quarters of high school seniors nationwide who use heroin started with prescription opioids.

134.    It is hard to imagine the powerful pull that would cause a law-abiding person who started on prescription opioids for an injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

135.    The need to address heroin use and addiction has imposed additional burdens on Springfield.

## II.    ROLE OF MANUFACTURER DEFENDANTS

136.    Manufacturer Defendants, with the idea that their drugs could reach a larger market of chronic pain sufferers, engaged in widespread, aggressive marketing campaigns focused solely on the benefits of their drugs.  In doing so, Manufacturer Defendants knew of, capitalized on, and actively and intentionally concealed the fact of patient tolerance of the analgesic effects of opioid drugs.  They specifically promoted the idea that pain should be a "vital sign."  They further promoted the idea that pain should be treated continuously by long-acting opioids (e.g., OxyContin, MS Contin, Nucynta ER, Duragesic, Opana ER, and Kadian) and supplemented with short-acting, rapid-onset opioids (e.g., Actiq and Fentora) for episodic pain.

137.    Marketing efforts, rather than any medical breakthrough, rationalized the prescribing of opioids for chronic pain, thereby opening the floodgates for opioid misuse, abuse, and addiction.

138.    One method of marketing common to all Manufacturer Defendants was direct-to-prescriber marketing.  Manufacturer Defendants met with prescribers through direct employee and third-party salespeople who conveyed their marketing messages and materials.  Through countless meetings, presentations, invitations to speak at events, bonus structures, brand perks, and expenses-paid trips, Manufacturer Defendants indoctrinated prescribers with the belief that opioids were appropriate—and even necessary—for treatment of chronic pain sufferers.

139.    This approach proved effective: a report by the U.S. Senate Homeland Security &
Governmental Affairs Committee found "a clear link [] between even minimal manufacturer
payments and physician prescribing practices."[29]

140.    Manufacturer Defendants also hosted Continuing Medical Education ("CME")
programs and, due to their control over the information that was provided, used such programs to
create a generation of doctors who accepted the message that opioid treatment was optimal for
their patients in pain.

141.    Manufacturer Defendants used puppet prescribers as "Key Opinion Leaders," who
promoted opioid drugs at speaking events and CME seminars under the guise that they were
sharing a genuine, considered medical opinion regarding treatment options for patients.  These
Key Opinion Leaders reaped rewards in the form of prestige, recognition, research funding, and
publications, through Manufacturer Defendants.

142.    Manufacturer Defendants published advertisements in medical journals, such as the
specialty-focused *Journal of Pain* and the *Clinical Journal of Pain* as well as the broad-audience
*Journal of the American Medical Association*.  This advertising became so aggressive during the
proliferation of the Opioid Epidemic that 2011 expenditures for solely medical journal advertising
by Manufacturer Defendants exceeded $14 million, with Purdue leading the pack at $8.3 million
expended.

143.    These marketing messages were riddled with misleading and unsupported
statements, beginning with the notion that opioids are safe and effective for long-term use, and
omitted warnings of the dangers of opioid use.

---

[29] Staff Report, Fueling an Epidemic, Insys Therapeutics and the Systemic Manipulation of Prior Authorization.

144.    For example, Defendant Purdue knowingly concealed the risks of opioid abuse.  In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction.  Purdue was ordered to pay $600 million in fines and fees.  In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science.

145.    In a statement announcing the guilty plea, John Brownlee, U.S. Attorney for the Western District of Virginia, stated:

> Purdue claimed it had created the miracle drug – a low risk drug that could provide long acting pain relief but was less addictive and less subject to abuse.  ***Purdue's marketing campaign worked, and sales for OxyContin skyrocketed – making billions for Purdue and millions for its top executives.***
>
> ***But OxyContin offered no miracles to those suffering in pain.  Purdue's claims that OxyContin was less addictive and less subject to abuse and diversion were false – and Purdue knew its claims were false.   The result of their misrepresentations and crimes sparked one of our nation's greatest prescription drug failures***. . . .  OxyContin was the child of marketeers and bottom line financial decision making.[30]

146.    Mr. Brownlee characterized Purdue's criminal activity as follows:

> First, ***Purdue trained its sales representatives to falsely inform health care providers that it was more difficult to extract the oxycodone from an OxyContin tablet for the purpose of intravenous abuse***.  Purdue ordered this training even though its own study showed that a drug abuser could extract approximately 68% of the oxycodone from a single 10 mg OxyContin tablet by simply crushing the tablet, stirring it in water, and drawing the solution through cotton into a syringe.
>
> Second, ***Purdue falsely instructed its sales representatives to inform health care providers that OxyContin could create fewer chances for addiction*** than immediate-release opioids.
>
> Third, ***Purdue sponsored training that falsely taught Purdue sales supervisors that OxyContin had fewer "peak and trough" blood level effects than***

[30]Press Release, U.S. Attorney for the Western District of Virginia, Statement of United States Attorney John Brownlee on the Guilty Plea of the Purdue Frederick Company and Its Executives for Illegally Misbranding OxyContin (May 10, 2007), https://assets.documentcloud.org/ documents/279028/purdue-guilty-plea.pdf.

*immediate-release opioids resulting in less euphoria and less potential for abuse* than short-acting opioids.

Fourth, ***Purdue falsely told certain health care providers that patients could stop therapy abruptly without experiencing withdrawal symptoms and that patients who took OxyContin would not develop tolerance*** to the drug.

And fifth, ***Purdue falsely told health care providers that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, had less abuse potential, was less likely to be diverted than immediate-release opioids***, and could be used to "weed out" addicts and drug seekers.[31]

147.    The other Manufacturer Defendants had similar practices.    Manufacturer Defendants even mocked the possibility of addiction while knowing the high risk of addiction associated with their products.  The phrase "pseudo-addiction" was used to convince patients that they were not *actually* addicted to opioids, they just thought they were.[32]  The use of the phrase contradicted both the reality of opioid use and the data available to Manufacturer Defendants that indicated that addiction and the possibility of addiction must be seriously considered.

148.    Manufacturer Defendants were admonished for making unsupported claims in marketing materials.  For example, as a result of an earlier investigation into opioid manufacturer Purdue's untoward practices, in 2007, the company executed a Corporate Integrity Agreement with the government pledging to ensure it only engaged in mutually-agreed upon, fair and accurate marketing, and engage in mutually agreed upon monitoring, and reporting compliance practices.

149.    Additionally, Insys was found to have promoted its drug Subsys for inappropriate use, provided illegal kickbacks to physicians who prescribed Subsys, marketed Subsys for use by

---

[31] *Id.*

[32] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide*, at 62 (Waterford Life Sciences 2007). This material was sponsored by the Federation of State Medical Boards, a group representing 70 medical and osteopathic boards in the United States that is substantially funded by Manufacturer Defendants Purdue, Cephalon, and Endo.

non-cancer patients, and misled and defrauded health insurance companies regarding patients' need for Subsys,[33] all to gain profits.

150. The wrongful behavior of Manufacturer Defendants continued after these administrative actions.

151. To avoid further scrutiny while still disseminating their unsupported claims, Manufacturer Defendants turned to "unbranded marketing." Unbranded marketing permitted Manufacturer Defendants to generalize their claims by not promoting one particular drug, but promoting the general use of opioid treatment.

152. Manufacturer Defendants further hid behind third-party groups to stay anonymous through their unbranded marketing campaigns, pushing the same misleading and unsupported message that opioids allow patients to have their life back after pain, permit patients to sleep, return to work, and resume physical activity.

153. The unbranded marketing messages were spread by physician groups like the National Pain Foundation, the American Chronic Pain Association, the American Society of Pain Educators, and the Academy of Integrative Pain Management, as well as through studies and treatises funded by Manufacturer Defendants.

154. Through these groups, Manufacturer Defendants inappropriately elevated favorable studies in widely-disseminated literature and failed to fairly reflect prevailing clinical views or substantial scientific support.

155. Working with these groups, Manufacturer Defendants also manipulated treatment guidelines by funding the guidelines' production. The Manufacturers then distributed, at no cost to the prescribers and through their third-party salespeople, literature and guidelines fabricated to

---

[33] Pharmaceutical Executives Charged in Racketeering Scheme, https://www.justice.gov/usao-ma/pr/pharmaceutical-executives-charged-racketeering-scheme (accessed Dec. 27, 2017).

reflect their intent that chronic pain patients should undergo opioid treatment irrespective of appropriateness and/or consequences.

156.     Manufacturer Defendants also provided a combined $8.8 million to purportedly neutral "patient advocacy" groups from 2012 through 2017.

157.     Overall, the message promoted by Manufacturer Defendants misled prescribers and consumers by misrepresenting that opioids improve patient functioning overall; falsely claiming that opioids have a low risk for addiction; misrepresenting the risk of addiction and the relationship between long-term opioid use and addiction; downplaying the severity of addiction and withdrawal by labeling the signs of addiction as "pseudo-addiction" and claiming that withdrawal can be easily managed; omitting information regarding non-addiction related side effects; and promoting the message that opioid treatment is a favorable initial treatment choice.

158.     Manufacturer Defendants' plans worked.  Opioids—once a niche drug—are now the most prescribed class of drugs in the United States; more frequently prescribed than blood pressure, cholesterol, or anxiety drugs.  While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global hydrocodone supply.  Together, opioids generated $8 billion in revenue for drug companies in 2012, and more than $15 billion in 2016.

## III.     ROLE OF DISTRIBUTOR DEFENDANTS

159.     Rather than selling opioids directly to physicians for prescribing, or to pharmacies for ultimate dispensing, Manufacturer Defendants sell to Distributor Defendants, who then disseminate the products to hospitals and pharmacies.

160.     The role of the pharmaceutical distributor is not simply one of shelf stocker, freight forwarder, simple shipper, or vending machine.  A sophisticated, "closed" distribution system

exists to move prescription drugs across the nation.  For many important reasons, this system relies upon the honesty, integrity, and accountability of distributors and pharmacies.

161.     Congress devised the closed chain of distribution specifically to prevent the diversion and abuse that is identified herein.  Under the closed-system, distributors must operate in accordance with the statutory provisions of the CSA, which requires the distributors to serve as the eyes and ears of regulators in identifying diversion threats.  Distributors are placed in a unique position to analyze data, which they obtain and track, regarding the amounts of prescription drugs flowing into pharmacies and facilities. They use said information to adjust quotas, forecast future sales, and report to federal and state agencies.

162.     Within this closed-system, federal law imposes specific duties upon wholesale distributors to monitor, identify, halt, and, perhaps most importantly, report "suspicious orders" of controlled substances. 21 C.F.R. § 1301.74, *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017).  The CSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. § 1301.74(b).  *See* 21 U.S.C. § 842(a)(5) & (c)(1)(B).

163.     To piggyback on and respond to these federal duties, distributors created a system of "self-regulation and best practice sharing" through an industry trade group called the Healthcare Distribution Alliance (HDA), formerly known as the Healthcare Distribution Management Association (HDMA).  Each of the Manufacturer and Distributor Defendants is a member of this trade group.

164.     According to the HDA, "[h]ealthcare distribution has never been just about delivery.  It's about getting the right medicines to the right patients at the right time, safely and efficiently."[34]

---

[34] *See* http://www.hdma.net/about/role-of-distributors

165. The HDA created "Industry Compliance Guidelines" based upon DEA requirements that stressed the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines provided: "At the center of a sophisticated supply chain, Distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers." Indeed, the HDA advises all distributors to "Know Your Customer."

166. In fact, as the dominant players within the healthcare distribution industry, senior executives from the Distributor Defendants have historically served on the board of the HDA or HDMA. Currently, Cardinal's CEO Jon Giacomin serves as the Chairman of HDA and McKesson's President Mark Walchirk serves on the executive committee of this powerful trade group.

167. The website for HDA at the time of filing explains that "[w]hile distributors do not prescribe or dispense drugs directly to patients, they do share a common goal with physicians, manufacturers, pharmacists, law enforcement officials and policymakers: to ensure a safe supply of medicines. The HDA holds itself out as an organization dedicated to keeping prescription painkillers out of the hands of people who may use them for purposes other than those for which they are intended."[35]

168. According to its website, members of HDA, including the Manufacturer and Distributor Defendants named herein, are committed to addressing the threat of prescription painkillers ending up misused or diverted. Their multilayered approach includes the following:

- Our members register with the DEA and follow rigorous statutory and regulatory requirements for the storage, handling and distribution of controlled substances. These sophisticated security systems and processes help safeguard the supply chain.

---

[35] *See* http://www.hdma.net/issues/prescription-drug-abuse-and-diversion

- Pharmaceutical distributors coordinate with a range of supply chain partners, as well as federal and state regulatory agencies, to help prevent the diversion of prescription drugs.

- We work with supply chain stakeholders, including pharmaceutical manufacturers, hospitals, retail pharmacies and other healthcare providers, to share information and develop strategies to identify and help prevent abuse and diversion.

- We work collaboratively with law enforcement and regulators to combat bad actors who attempt to breach the security of the legitimate supply chain, coordinating with law enforcement and regulators to offer information technology, security and logistics expertise that helps locate and prosecute individuals who attempt to misuse and divert prescription drugs from the legitimate supply chain.

- We take steps to "know our customers," including actively assessing and reviewing purchases from pharmacies and healthcare providers that order controlled substances to monitor and report to the DEA if a customer's controlled substances volume or pattern of ordering might signal inappropriate use of the product. If inappropriate use is suspected, distributors work proactively with DEA, local law enforcement and others to help in the investigation of potential diversion cases.

- We provide the DEA with additional data and reports to aid their efforts to seek out criminal behavior. Distributors communicate about any handling of selected controlled substances to the DEA's reporting system, Automation of Reports and Consolidated Orders System (ARCOS). This system monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to the point of sale at the dispensing/retail level.

169. Individual Defendant Distributors also vaunt their compliance processes. For example, Defendant McKesson uses programs that permit real time product lookup and availability, as well as control over ordering, purchasing, reconciliations, and account management.

170. Defendant McKesson further follows Six Sigma methodology, which according to a 2013 annual shareholder report, is "an analytical approach that emphasizes setting high-quality objectives, collecting data and analyzing the results to a fine degree in order to improve processes, reduce costs and minimize errors."

171. Like Defendant McKesson, Defendant Cardinal also employs lean Six Sigma

methods in its operations. Defendant Cardinal began its "lean journey" in 2007, as part of an initiative to drive collaboration in the health care supply chain, with the goal of achieving zero errors, zero waste, and zero lost revenue. According to a 2012 article, Defendant Cardinal's Vice President of Inventory Management Andy Keller reported that "the company uses predictive analytics, fed by transactional information provided by suppliers, to increase the speed of communication from the manufacturer to the end customer."[36] Mr. Keller further opined that "[w]e're a critical link in the supply chain because we talk to both suppliers and health care providers."

172. Defendant AmerisourceBergen similarly employs Lean Six Sigma methods. According to its website, AmerisourceBergen claims: "[t]hrough our state-of-the-art supply chain technology and Lean Six Sigma-compliant business processes, your pharmacy and patients will benefit from the safest, most secure and efficient distribution system in healthcare."[37] Defendant AmerisourceBergen also boasts of "an average order accuracy rate of 99.99 percent, powered by high-touch customer support services and the latest self-service technologies that enable us to stay on top of every order."[38]

173. Defendant AmerisourceBergen also claims that its "26 world-class distribution centers leverage sophisticated workflow technology, inventory tracking systems and delivery route planning tools to bring you the products you need—when you need them most."[39]

174. In spending millions of dollars on systems and technology to collect and analyze robust data and utilizing Lean Six Sigma methodology, Distributor Defendants should have, and

---

[36] See http://www.industryweek.com/supply-chain/supply-chain-and-logistics-lean-six-sigma-keeps-cardinals-supply-chain-healthy?page=1
[37] See http://www.amerisourcebergen.com/abcnew/pharmacies/solutions/global-sourcing-and-distribution.aspx
[38] Id.
[39] Id.

likely did in fact, learn the extent of their lethal over shipments to Springfield. But rather than take steps to protect the end customer from the dangerous and addictive drugs, all Distributor Defendants chose to ignore their own reports, data, and analysis and keep the supply lines open.

175. The claims and allegations contained herein are not new to Distributor Defendants, who have ignored their legal duties in the past. For example, in 2008, Defendant McKesson paid the Department of Justice ("DOJ") $13.25 million for failing to comply with its obligations under the CSA. Specifically, the government alleged that McKesson failed to report suspicious orders for opioids from internet pharmacies.

176. The DOJ settlement was no deterrent. On January 17, 2017, the DOJ announced it had reached yet another settlement with Defendant McKesson, this time to pay $150 million to resolve allegations McKesson had violated the CSA by filling millions of orders for drugs, including highly addictive opioids, without sufficient anti-abuse safeguards.

177. According to the press release, "[f]rom 2008 until 2013, McKesson supplied various U.S. pharmacies an increasing amount of oxycodone and hydrocodone pills, frequently misused products that are part of the current opioid epidemic."[40]

178. As part of the nationwide settlement, Defendant McKesson agreed to suspend sales of controlled substances from distribution centers in Colorado, Ohio, Michigan, and Florida for multiple years, which the DOJ touted as the "most severe sanctions ever" agreed to by a DEA-registered distributor.

179. Similarly, in 2008 Cardinal paid a $34 million fine for failing to report suspicious orders of hydrocodone. More recently, in 2012 Defendant Cardinal's Lakeland, Florida warehouse

---

[40] Dep't of Justice, U.S. Attorney's Office, Middle District of Florida, *McKesson Agrees To Pay Record $150 Million Settlement For Failure To Report Suspicious Orders Of Pharmaceutical Drugs* (Jan. 17, 2017), *available at* https://www.justice.gov/usao-mdfl/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

was suspended by the DEA for two years as a result of shipping suspect orders of opioids.

180.     Distributor Defendants were on notice that the opioids they distributed were the kinds that were susceptible to being diverted for illegal purposes, abused, overused, and otherwise sought for illegal, unhealthy, or problematic purposes.

181.     The information available to Distributor Defendants inherently places them at a superior position with regards to foreseeing any addiction and abuse issues arising in communities from the disproportionate amount of opioids requested when compared to the population of the county.

182.     Distributor Defendants knew or should have known that they were supplying vast amounts of dangerous drugs to disproportionately small markets that were already facing abuse, diversion, misuse, and other problems associated with the opioid epidemic.

183.     Specifically, Distributor Defendants knew, or should have known, that their over-distribution of opioids into Springfield was causing an exceedingly high rate of illegal use, abuse, misuse, and diversion of prescription opioids.  Numerous publications, news sources and studies highlighted the epidemic rate of opioid abuse and overdose rates in Missouri.

184.     Furthermore, Distributor Defendants knew or should have known that the millions of doses of highly addictive opioids they were shipping into relatively small Springfield were far in excess of the legitimate needs for Springfield and should have been stopped and/or investigated suspicious orders.

185.     Distributor Defendants knew or should have known that there was a high likelihood that a substantial number of the opioids they supplied to pharmacies and drug stores in Springfield were being diverted to illegal use or abuse.

186.    Though they had a duty to the consuming public, both collectively and individually, Distributor Defendants failed to take any action to effectively prevent, minimize, or reduce the distribution or availability of these dangerous drugs.

187.    Distributor Defendants knowingly filled, and failed to report, suspicious orders in Springfield from 2007 to the present.

188.    Distributor Defendants undertook no discernible efforts to determine whether the volume of prescription opioids they were shipping to Springfield was excessive and whether any of the orders they filled qualified as suspicious orders, which should have been refused.

189.    When customer orders breached the volume thresholds set up by Distributor Defendants to meet their regulatory requirements, the Distributor Defendants simply adjusted their limits to allow for more dangerous and addictive pills to enter Springfield.

190.    Upon information and belief, Distributor Defendants have failed to refuse to ship or supply opioids to Springfield, between 2007 and the present.

191.    Indeed, Distributor Defendants paid their sales force employees' and managers' bonuses and commissions based upon the sale of most, or all, of the highly addictive opioids supplied to Springfield.

192.    This commission-structure business model was a frequently used tool to promote the sale of opioids. Distributor Defendants gave their employees monetary awards, while Manufacturer Defendants gave Key Opinion Leaders expenses-paid trips to speaking engagements where they promoted Manufacturer Defendants' opioid medications as the treatment of choice for chronic pain.

193.    When the population of Springfield is taken into consideration, Distributor Defendants delivered an excessive and unreasonable number of highly addictive controlled substances to Springfield.

194.    Distributor Defendants' intentional distribution of excessive prescription pain killers to Springfield showed a reckless disregard for the safety of Springfield and its residents.

195.    The result of Distributor Defendants' actions has been catastrophic for Springfield and its residents, while the Distributor Defendants profited substantially from the opioids sold there.

## IV.    ROLE OF PBM DEFENDANTS

196.    PBMs are brokers between payors (representing patients), drug manufacturers, and retailers and they influence which drug products are used most frequently and set prices for pharmacies.  Their primary function is to authorize public and private insurance coverage for treatments, ensuring that individuals can afford to fill their prescriptions.

197.    PBMs control drug formularies, which set the criteria and terms under which pharmaceutical drugs are reimbursed.  Specifically, PBM formularies determine what drugs: (a) will be available (or not available) to patients; (b) for what diagnosis, efficacious or otherwise; (c) in what quantities; (d) at what co-pay; (e) what level of authorization will be required; and (f) what beneficial drugs will not be available.  PBMs have the power to limit the number of pills available for legitimate and illegitimate consumption.  In this way, PBMs control overall prescription drug utilization.

198.    Juliette Cubanski, of the Kaiser Family Foundation recently explained the PBMs' power as follows: "pharmaceutical companies negotiate with PBMs for greater market exposure for their products by offering steeper rebates in exchange for favorable formulary placement.  The

alternative is that PBMs place drugs on non-preferred tiers or don't cover medications on their formulary at all."[41]

199.    According to a STAT report "the deals these companies strike with drug makers are kept secret, so no one besides the PBM knows how much of the rebate is actually passed on to consumers. In some cases, [the PBMs] keep more than what they pay the maker for the drug."[42]

200.    There are many possible justifications for a PBM's authorization of coverage of a particular treatment, one of which is cost effectiveness.  Unfortunately, cost effectiveness appears to have been the priority, rather than a factor, in the approval of opioid treatment for the years 2007 through 2016.

201.    PBMs can extract rebates and other incentives from Manufacturer Defendants because of the PBMs' market power.  The three largest PBMs, Caremark, Express Scripts, and OptumRx (all named Defendants here), manage drug benefits for more than 180 million individuals, more than 70% of the PBM market.[43]  In 2015, these three companies managed most of the four billion retail prescriptions that were covered in the United States.[44]  Collectively, PBMs made almost $260 billion in 2016.[45]  They are key participants and play a crucial role in the administration of prescription drugs.[46]  PBM influence is notable especially considering the lack

---

[41] Jaclyn Cosgrove, *What the $52-billion Cigna purchase of Express Scripts means for consumers*, L.A. TIMES, March 12, 2018, http://www.latimes.com/business/la-fi-cigna-mergers-20180312-htmlstory.html.

[42] Haider Warraich, *A costly PBM trick: set lower copays for expensive brand-name drugs than for generics*, STAT, March 12, 2018, https://www.statnews.com/2018/03/12/pbm-copays-brand-name-drugs-generics/.

[43] *PBMs*, Nat'l Community Pharmacists Ass'n, http://www.ncpanet.org/advocacy/pbm-resources/what-is-a-pbm- (last visited Mar. 25, 2018).

[44] Lydia Ramsey and Skye Gould, *A huge pharma middleman just lost its biggest customer — and it shows how drug pricing really works*, BUS. INSIDER, Apr. 25, 2017, http://www.businessinsider.com/express-scripts-esrx-anthem-not-renewing-pbm-2017-4.

[45] John Breslin, *Health care experts call for more transparency into PBMs*, PATIENTDAILY, Dec. 20, 2017, https://patientdaily.com/stories/511298841-health-care-experts-call-for-more-transparency-into-pbms.

[46] *See generally*, Health Policy Brief, *Prescription Drug Pricing #12: Pharmacy Benefit Managers*, HEALTH AFFS., Sep. 14, 2017, https://www.healthaffairs.org/do/ 10.1377/hpb20171409.000178/full/ (hereinafter "*Health Policy Brief*").

of competition in the PBM space. Market concentration is an important indicator of a company's ability to earn extraordinary returns, and several segments in the United States pharmaceutical distribution system are highly concentrated.[47]

202.    With this kind of monopolistic structure, the three largest PBMs have almost exclusive control over the dissemination of opioids. In concert with drug manufacturers who provide them with assorted forms of incentive payments, including rebates, PBMs choose which drugs will be on a health plan's formulary and under what terms, thus determining which drugs will be reimbursed.[48]    No drug will leave a pharmacy if it is not paid for. Thus, PBMs control which drugs are dispensed and which drugs enter Springfield.

203.    Every PBM Defendants' formulary is influenced by its financial arrangements with drug manufacturers.

204.    For example, notwithstanding its express assurance to its customers that it "agrees to act as a fiduciary in good faith, with candor and due diligence in connection with the performance of [its PBM contract] and any negotiations related thereto,"[49] OptumRx then proceeds to define its formulary as follows:

> A list of prescription drugs administered by PBM that has been evaluated by the PBM for inclusion on its formulary ("***Formulary***"). . . [T]he drugs included on the PBM's Formulary may be modified by PBM, with prior approval by [client], from time-to-time as a result of factors including, but not limited to, medical appropriateness, *manufacturer rebate arrangements* and patent expirations.[50]

205.    OptumRx does not explain how "manufacturer rebate arrangements" impact its formulary design.

---

[48] Health Policy Brief, *supra* note 47.
[49] United Healthcare Servs., Inc. & Emps. Ret. Syst. of Tex., Pharmacy Benefit Management Services Executed Contract, Art. 2.3 (2016), https://ers.texas.gov/Doing-Business-with-ERS/PDFs/Contract-for-Pharmacy-Benefit-Management-Services-for-the-HealthSelect-Prescription-Drug-Program.pdf.
[50] *Id.* at Art. 4.1(h)(i) (second emphasis added).

206.     Express Scripts likewise is paid by drug manufacturers based on formulary design:

> Express Scripts contracts for its own account with pharmaceutical manufacturers to obtain rebates attributable to the utilization of certain prescription products by individuals who receive benefits from clients for whom we provide PBM services. *Rebate amounts vary based on the volume of utilization as well as the benefit design and formulary position applicable to utilization of a product.* Express Scripts often pays all or a portion of the rebates it receives to a client based on the client's PBM services agreement. Express Scripts retains the financial benefit of the use of any funds held until payment is made to a client. In connection with our maintenance and operation of the systems and other infrastructure necessary for managing and administering the rebate process, *Express Scripts also receives administrative fees from pharmaceutical manufacturers participating in the rebate program discussed above. The services provided to participating manufacturers include making certain drug utilization data available, as allowed by law, for purposes of verifying and evaluating the rebate payments.* The administrative fees paid to Express Scripts by manufacturers for participation in the rebate program do not exceed 3.5% of the AWP of the rebated products.[51]

207.     Express Scripts does not commit to share all of the rebates it receives from drug manufacturers with its clients, nor does it commit to share any of the administrative fees. Nor does it explain all of the services for which it receives the administrative fees. Nor does it explain how any of these payments actually influence its formulary design.

208.     Express Scripts' standard contract language contemplates that it will derive even further revenue from drug manufacturers in other vaguely described arrangements, none of which are shared with its customers:

> [I]f any, ESI and ESI's wholly-owned subsidiaries derive margin from fees and revenue in one or more of the ways as further described [herein] . . . . ESI and ESI's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for Sponsor, Members or the Plan. *ESI and ESI's wholly-owned subsidiaries retain all proprietary rights and beneficial interest in such fees and revenues* described in the Financial Disclosure and, accordingly, *Sponsor acknowledges that*

---

[51] Express Scripts, Inc. & Oklahoma City Mun. Facility Auth., Pharmacy Benefit Management Agreement at 30, Ex. E (2008), http://nationalprescriptioncoveragecoalition.com/wp-content/uploads/2017/07/WebPage-2.pdf (emphasis added). Notably, the Average Wholesale Price (AWP) is a reported price higher than any Express Scripts customer pays for any drug.

*neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such fees or revenues.*[52]

209. A standard Caremark PBM Contract reflects similar perverse incentives. It explains that "'Manufacturer' means a pharmaceutical company that has contracted with Caremark (or its affiliate or agent) *to offer discounts for pharmaceutical products in connection with Caremark's Formulary Services.*"[53]

210. "Manufacturer Payments" include revenues received by Caremark, from a variety of sources, including:

> 1) payments received in accordance with agreements with pharmaceutical manufacturers for formulary placement and, if applicable, drug utilization; 2) rebates, regardless of how categorized; 3) market share incentives; 4) commissions; 5) any fees received for the sale of utilization data to a pharmaceutical manufacturer; 6) educational grants; 7) administrative management fees; and 8) all compensation from manufacturers including rebates paid by a manufacturer as a result of product inflation caps and/or guarantees negotiated by the Service Provider.[54]

211. Caremark's standard PBM contract further explains:

> that, in lieu of billing Member County a 'per Claim' fee for Services, Caremark shall retain 100% of the Rebates as reasonable compensation for the Services. Customer and Member County understand and agree that neither they nor any Participant will share in the Rebate monies collected from Manufacturers by Caremark.[55]

212. Caremark also explains that it will encourage the use of its "Preferred Drugs" (those where it has the most lucrative arrangement with a drug manufacturer) over "non-Preferred" drugs. Its standard contract language states that Caremark will encourage the use of "Preferred Drugs" by:

---

[52] *Id.* at 89, § 6.4 (emphasis added).
[53] CaremarkPCS Health, L.P. & Nat'l Ass'n of Cntys., Managed Pharmacy Benefit Service Agreement at 10, § 10(f) (2006), http://www.nassauclerk.com/agendaindex/Ordinances/other/CS-08-125.pdf (emphasis added).
[54] CaremarkPCS Health, L.L.C. and Fl. Dep't of Mgmt. Servs., Pharmacy Benefit Management Services, at 7, § 1.1 (2015), https://www.dms.myflorida.com/content/download/107930/607791/.
[55] CaremarkPCS Health, L.P. & Nat'l Ass'n of Cntys., supra note 116, at 4, § 2.1.

(i) identifying appropriate opportunities for converting a prescription from a non-Preferred Drug to a Preferred Drug, and (ii) contacting the Participant and the prescriber to request that the prescription be changed to the Preferred Drug. A Preferred Drug is one on the Performance Drug List, which has been developed by Caremark as a clinically appropriate *and economically advantageous subset of the Caremark Formulary*, as revised by Caremark from time to time.[56]

213.    MedTrak similarly operates as "a traditional spread-based PBM" that does not pass all of its rebates, discounts, and incentives on to its customers.

214.    PBMs have made it more difficult to secure pain medication that is less addictive than opioids, because opioids are generally cheaper than non-opioid alternatives and opioid manufacturers have provided rich incentives through the schemes described above.

215.    Even when asked to limit accessibility to opioids, PBMs refused.  The seeds of the opioid epidemic were sown with early prescriptions of OxyContin.  In 2001, Purdue officials "interrupt[ed]" West Virginia efforts to require prior authorization for OxyContin, limiting coverage of the drug to terminally ill cancer patients, with respect to the state employee health plan.  Using the financial quid pro quo it had with the state's PBM, it paid Merck Medco (now Express Scripts) to prevent the plan from limiting access to the drug.[57]

216.    This approach was not limited to just this plan:

> The strategy to pay Merck Medco extended to other big pharmacy benefit managers and to many other states, according to a former Purdue official responsible for ensuring favorable treatment for OxyContin.  The payments were in the form of "rebates" paid by Purdue to the companies.  In return, the pharmacy benefit managers agreed to make the drug available without prior authorization and with low copayments.
>
> "That was a national contract," Bernadette Katsur, the former Purdue official, who negotiated contracts with pharmacy benefit managers, said in an interview.  "We would negotiate a certain rebate percentage for keeping

---

[56] *Id.* at 3, § 1.11.
[57] David Armstrong, *Drug maker thwarted plan to limit OxyContin prescriptions at dawn of opioid epidemic*, STATNEWS, Oct. 26, 2016, https://www.statnews.com/2016/10/26/oxycontin-maker-thwarted-limits/.

it on a certain tier related to copay or whether it has prior authorization.  We like to keep prior authorization off of any drug." [58]

217.    In addition to placing roadblocks in the way of limiting excessive opioid prescriptions, PBMs also make it more difficult to obtain Abuse Deterrent Formula (ADF) opioids.[59]  The three largest PBMs cover no more than three of the ten FDA-approved ADF opioids.  These pills are more difficult to physically alter (crushing to snort or dissolving to inject) and therefore are less prone to abuse.  As a result, 96% of all opioid products prescribed in 2015 were non-ADF.[60]

218.    The denial of ADF opioids was endorsed by the Institute for Clinical and Economic Review, a private organization funded in part by some of the largest health plans and PBMs, that claimed that ADF opioids provided neither financial or societal benefits, even though it was well-established that ADF OxyContin could prevent 4,300 cases of abuse over a five-year period.[61]

219.    According to one opinion

> ICER ignored research that demonstrated abuse deterrent  Oxy reduced abuse by 20 percent and reduced the average daily dose of OxyContin from 80mg to 60mg.  Perhaps even more important, it reduced sharing and selling of the drug for getting high ("diversion") by nearly 90 percent.  The diversion of generic painkillers is responsible for as many as 63 percent of fatal prescription drug overdoses.  ICER consciously decided to ignore the human cost of this deadly behavior.
>
> What the ICER report ignores entirely is that one of the factors driving abuse and addiction is the inappropriate use of generic opioids for conditions that have non-opioid, on-label options.  Fifty-two percent of patients diagnosed with osteoarthritis receive an opioid pain medicine as

---

[58] Id.

[59] Charles L. Bennett, *Do you have pain, cancer, or diabetes? Your PBM may now be your doctor for these illnesses*, COLLABRX, Dec. 27, 2017, http://www.collabrx.com/pain-cancer-diabetes-pbm-may-now-doctor-illnesses/ (PBMs are "driving patients to opioids, away from abuse-deterrent form (ADF) and less addictive forms of opiates through formulary and pricing strategies.").

[60] Peter J. Pitts, *Pharmacy benefit managers are driving the opioid epidemic*, SHAKOPEE V. NEWS, Nov. 21, 2017, http://www.swnewsmedia.com/shakopee_valley_news/news/opinion/guest_columns/pharmacy-benefit-managers-are-driving-the-opioid-epidemic/article_2f6be2a1-c7a3-5f8d-9f3e-61d29d25c84b.html.

[61] Robert Goldberg & Peter Pitts, *ICER Perpetuates the Opioid Crisis, Morning Consult*, MORNING CONSULT, May 11, 2017, https://morningconsult.com/opinions/icer-perpetuates-opioid-crisis/.

first-line treatment, as do 43 percent of patients diagnosed with fibromyalgia and 42 percent of patients with diabetic peripheral neuropathy.[62]

220. Similarly, according to a study by the New York Times and ProPublica, of 35.7 million people on Medicare prescription drug plans, in the second quarter of 2017 only one-third of such persons had access to Butrans, a drug that contains a less-risky opioid, buprenorphine. Additionally, every drug plan required prior authorization for patients to receive non-addictive lidocaine patches.[63]

221. For example, "UnitedHealthcare places morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans. And it places Lyrica, a nonopioid, brand-name drug that treats nerve pain, on its most expensive tier, incentivizing patients to try other drugs first."[64]

222. In at least one case, Defendant OptumRx suggested that a member taking Butrans consider switching to a "lower cost alternative," such as OxyContin or extended-release morphine, according to a letter provided by the member.[65]

223. The same New York Times/Pro Publica study also found that PBMs have erected additional hurdles to approving addiction treatments than for the addictive substances themselves.[66]

---

[62] Id.
[63] Katie Thomas & Charles Ornstein, *Amid Opioid Crisis, Insurers Restrict Pricey, Less Addictive Painkillers*, N.Y. TIMES, Sept. 17, 2017, https://www.nytimes.com/2017/09/17/health/opioid-painkillers-insurance-companies.html.
[64] Id.
[65] Id.
[66] Thomas & Ornstein, *supra* .

224.     Reports have also found that, "[t]o improve their bottom line, [PBMs are] "blocking access to prescriptions that can help prevent overdoses."[67]

225.     The efforts to artificially increase the number of opioid prescriptions, implemented by PBMs, directly and predictably caused a corresponding increase in opioid abuse.  In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[68]  Many abusers start with legitimate prescriptions. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "[t]o reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[69]  The PBMs' role in increasing prescriptions played an enormous role in the current opioid epidemic.

226.     PBMs have access to all of the prescriptions filled by their members.  PBMs also have the capacity to "perform prescription claims reviews using software algorithms to identify prescribers, pharmacies, or patients who may be using opioids unsafely or else potential fraudulently prescribing, dispensing or using opioids. For example, PBMs may perform retrospective analyses to identify members visiting multiple prescribers or pharmacies, exceeding a threshold of morphine milligram equivalent (MME) daily or filling multiple simultaneous controlled substance claims."[70]  Yet, upon information and belief, despite this capability, the PBM

---

[67] Peter J. Pitts, *Pharmacy benefit managers are driving the opioid epidemic*, SW NEWS MEDIA, Nov. 21, 2017, http://www.swnewsmedia.com/shakopee_valley_news/news/opinion/guest_columns/pharmacy-benefit-managersare-driving-the-opioid-epidemic/article_2f6be2a1-c7a3-5f8d-9f3e-, 61d29d25c84b.html.
[68] Rose A Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 64 MORBIDITY & MORTALITY WKLY REP. 1378, 1381 ( Jan. 1, 2016), *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.
[69] *Id*.
[70] *The Opioid Epidemic: From Evidence to Impact*, Johns Hopkins Bloomberg School of Pub. Health & the Clinton Found. (Oct. 2017), https://www.jhsph.edu/events/2017/americas-opioid-epidemic/report/2017-JohnsHopkins-Opioid-digital.pdf; s*ee also Managing opioid prescribing and use through pharmacy benefit programs*, Nat'l Safety Council (2014),http://www.nsc.org/RxDrugOverdoseDocuments/RxKit/EMP-Managing-Opioid-Prescribing-and-Use-Through-Pharmacy-Benefit-Programs.pdf ("PBMs *should* provide program 'flags' or warnings to alert the dispensing pharmacist to possible opioid over use and abuse" (emphasis added)).

Defendants continued to authorize coverage for millions of unnecessary and/or inappropriate opioid prescriptions.

227. The PBM Defendants are complicit in the overall fraudulent scheme. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements that would slow down the flow of prescriptions.

228. PBMs require, and receive, incentives from Manufacturer Defendants to keep certain drugs on and off formularies. These incentives include the payment of rebates by Manufacturers Defendants to PBMs based on utilization, bonuses for moving product and hitting volume targets, and the payment of lucrative administrative fees to maximize PBM profits. Much of this activity is not transparent to anyone, including those who in good faith hire PBMs to manage their benefits.

229. There are steps the PBMs could take. They could make it easier to access other non-addictive forms of pain relief. They could require doctors to start treating pain first with non-opioid pain medications as recommended by the CDC and turn to opioids as a last resort. They could make addiction treatment more accessible. They could make their pricing more transparent so everyone could see if they were being improperly influenced by manufacturers to make choices for financial, not medical reasons. But they chose not to for their own financial gain.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT
### DECEPTION, FRAUD, AND MISREPRESENTATION
### (ALL DEFENDANTS)

230. Plaintiff incorporates by reference the allegations in paragraphs 1 through 229.

231.     Missouri law disallows any use of unfairness, deception, and fraud in connection with the sale of "merchandise," defined as including goods and services.  *See* Rev. Stat. §§ 407.010, 407.020 (2017), *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W. 3d 758, 768 (Mo. 2007) (en banc).

232.     Defendants engaged in "deception" and "misrepresentation" in connection with the marketing, advertising, sale, and delivery of opioids in Springfield and throughout the State of Missouri in violation of Missouri Statutes Chapter 407.020.

233.     The deception, fraud, and misrepresentation engaged in by Manufacturer Defendants includes but is not limited to:

a.  misrepresenting the safety and efficacy of opioids for treatment of many conditions including but not limited to chronic pain;
b.  misrepresenting the addictive nature of opioids;
c.  misrepresenting that opioids improve the overall function of patients;
d.  misrepresenting the severity and likelihood of opioid addiction;
e.  misleading doctors, patients, insurers, the government, and the general public, including through use of misleading terms like "pseudoaddiction;"
f.  misrepresenting patients' future need for increased dose amounts and frequency;
g.  falsely claiming that withdrawal is easily managed;
h.  omitting or minimizing the adverse effects of opioids and overstating the risks of alternative pain management; and
i.  misrepresenting and/or hiding facts regarding the high likelihood of abuse and diversion of opioids.

234.     Distributor Defendants abetted the fraudulent behavior of Manufacturer Defendants by engaging in independent fraudulent and deceptive behavior.  Distributor Defendants acted fraudulently and deceptively in failing to report information regarding the suspicious orders and copious amounts of opioids being distributed into Springfield.  Distributor Defendants affirmatively concealed the regular distribution of large quantities of commonly abused, highly-addictive controlled substances to clients who were serving a customer base comprised of

individuals who were abusing prescription medications, many of whom were, or reasonably could be expected to become, addicted or engaged in illicit drug transactions.

235.    PBM Defendants deceptively failed to disclose rebates and other perverse financial incentives that influenced their formulary design and related reimbursement policies.   They prevented alternative pain treatment options from becoming accessible to patients such that opioid therapy was the only viable, covered option.

236.    At the time that Defendants engaged in this wrongful conduct, Defendants knew their representations were false, fraudulent, and deceptive, or that they lacked a reasonable basis for such representations.

237.    The deception, fraud, and misrepresentation engaged in by Defendants occurred in Springfield and caused harm in Springfield.  Defendants intended for the residents and City of Springfield, including its medical professionals, pharmacists, and elected officials, to rely on their misrepresentations, fraud, and deception.

238.    As a direct and proximate result of Defendants' wrongful conduct, the City expended public monies to mitigate the damage caused by opioids in the community and repair the injuries described in this Complaint.

239.    Plaintiff has suffered unique damages as a result of the public nuisance created by Defendants due to Plaintiff's unique position as a city within the State of Missouri. This harm includes, but is not limited to:

    a.   increased healthcare costs;
    b.   increased incidence of NAS and costs associated with resulting need for hospitalization and care of NAS affected infants;
    c.   increased expenditure on emergency healthcare and medical services;
    d.   lost value of productive and health community members and City employees;
    e.   increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the City;
    f.   increased availability of drugs for criminal use and resulting increase in crime;

g. increased incidence of heroin addicts who progressed from opioids to the use of heroin;

h. increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to crime;

i. general interference with the enjoyment of life in Plaintiff's community;

j. increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, and probation; and

k. increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

240. Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Defendants' actions.

241. Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' deceptive practices. Plaintiff does not seek damages for physical injury, mental anguish, or emotional harm, or any physical damages to property caused by Defendants' actions.

242. As a direct and proximate result of Defendants' wrongful conduct, Springfield was injured and continues to be injured, as Defendants' ongoing, concerted marketing efforts and related activity caused doctors and other healthcare providers to prescribe and Springfield to pay for long-term opioid treatment. Defendants caused and are responsible for those costs.

## COUNT II
## VIOLATION OF RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS ACT
## (18 U.S.C. § 1962(C)-(D))
## (ALL DEFENDANTS)

243. Plaintiff incorporates by reference the allegations in paragraphs 1 through 229.

244. At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

245.    RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

246.    RICO, among other provisions, makes it unlawful for "any person to conspire to violate" the provisions of 18 U.S.C. § 1962(c). 18 U.S.C. § 1962(d).

247.    As alleged herein, at all relevant times, Defendants moved aggressively to both increase the size of the opioid sales market and then capture a large portion of that market. In so doing, the Manufacturer Defendants launched an aggressive nationwide campaign over-emphasizing the under-treatment of pain and deceptively marketing opioids as being: (i) rarely, if ever, addictive; (ii) safe and effective for the treatment of chronic pain; (iii) abuse resistant or deterrent; or (iv) safe and effective for other types of pain for which the drugs were not approved.

248.    All Defendants knowingly failed to report suspicious orders as required by state and federal law, thereby inundating the market with opioids. In particular, Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (the "Opioid Fraud Enterprise"), whose purpose was to deceive opioid prescribers, the public, and regulators into believing that opioids were safe and effective for the treatment of chronic pain and presented minimal risk of addiction and/or that Defendants were in compliance with their state and federal reporting obligations. In doing so, Defendants sought to maximize revenues from the design, manufacture, sale and distribution of opioids which, in fact, were highly addictive and often ineffective and dangerous when used for chronic and other types of pain.

249.    As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract billions of dollars of revenue.  As explained in detail below, Defendants' years-long misconduct violated 18 U.S.C. § 1962(c) and (d).

**(a)    The Opioid Fraud Enterprise**

250.    At all relevant times, Defendants, along with other individuals and entities, including unknown third parties involved in the marketing and sale of opioids, operated an "enterprise" within the meaning of 18 U.S.C. § 1961(4), because they are a group of individuals associated in fact, even though they are not a collective legal entity.

251.    The Opioid Fraud Enterprise: (i) had an existence separate and distinct from each of its component entities; (ii) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (iii) was an ongoing organization consisting of legal entities, including, but not limited to, the Manufacturer Defendants, the Distributor Defendants, pharmacies, employees and agents of the front group organizations, as well as other entities and individuals, including physicians.

252.    Within the Opioid Fraud Enterprise, there was a common communication network by which members exchanged information on a regular basis through the use of wires and mail. The Opioid Fraud Enterprise used this common communication network for the purpose of deceptively marketing, selling, and distributing opioids to the general public.  When their products, sales, distributions, and failure to report suspicious sales were contested by other parties, the enterprise members took action to hide the scheme to continue its existence.

253.    The participants in the Opioid Fraud Enterprise were systematically linked to each other through corporate ties, contractual relationships, financial ties, and the continuing coordination of activities.  Through the enterprise, Defendants functioned as a continuing unit with

the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share and minimizing losses.

254.    Each member of the Opioid Fraud Enterprise shared in the bounty generated by the enterprise by sharing the benefit derived from increased sales of opioids and other revenue generated by the scheme to defraud prescribers and consumers and fail to report suspicious sales in Springfield.

255.    The Opioid Fraud Enterprise engaged in and continues to engage in the deceptive marketing of opioids as non-addictive, as safe and effective for chronic pain, and for uses which have not been FDA-approved, and the failure to report suspicious sales.  The Opioid Fraud Enterprise has engaged in such activity for the purpose of maximizing the sale and profits of opioids.

256.    To fulfill its purpose, the enterprise has advocated for and caused the over-prescription and over-distribution of opioids by marketing, promoting, advertising, and selling opioids throughout the country and across state boundaries and by failing to report suspicious sales. Their receipt of monies from such activities consequentially affected interstate and foreign commerce.  The enterprise's past and ongoing practices thus constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

257.    The Opioid Fraud Enterprise functioned by marketing, selling, and distributing opioids to states, counties, other municipalities, doctors, healthcare organizations, pharmacies, and the consuming public, while failing to report suspicious sales.  Defendants as co-conspirators, through their illegal enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals

associated-in-fact with the enterprise's activities through the deceptive marketing and sale of opioids and the failure to report suspicious sales.

258.     Defendants participated in the operation and management of the Opioid Fraud Enterprise by directing its affairs, as described herein.  While Defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

259.     Each of the members of the Opioid Fraud Enterprise furthered the ends of the enterprise, through the acts and omissions pleaded above and herein.

260.     Each of the Manufacturer Defendants relentlessly promoted opioids as having little to no risk of addiction, as being safe and effective for the treatment of chronic pain and/or other uses for which the drugs were not approved.   The Manufacturer Defendants' success in maximizing sales was due to the tight collaboration among the Manufacturer Defendants through and in collaboration with the pain foundations – a formidable partnership that marketed to hundreds of thousands of prescribers across the country, including prescribers in Springfield.  The relationship was strengthened, in part, by individuals, including physicians that held different leadership roles at different times across the various entities participating in the enterprise over the years.

261.     On numerous occasions, Manufacturer Defendants funded the pain foundations' marketing efforts.   Manufacturer Defendants specifically chose to partner with the pain foundations and individual physicians to publish and otherwise disseminate misleading pro-opioid material, knowing the public and prescribers would be more receptive to statements made by what they perceived to be scholarly, neutral, third-party sources.

262.    The Manufacturer and PBM Defendants conspired to increase the use of the least expensive, most addictive opioids by controlling the drugs' placement on the formularies. These formularies controlled which opioids were paid for, reimbursed, and covered by public and private insurers. The Manufacturer and PBM Defendants coordinated to ensure that the maximum number of Manufacturers' opioids were prescribed and sold and that the PBM Defendants profited to the maximum extent at the expense of patients.

263.    Furthermore, all Defendants knowingly failed to design and operate a system to disclose suspicious orders of controlled substances and failed to notify the appropriate DEA field division offices in their areas of suspicious orders, including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

264.    The members of the Opioid Fraud Enterprise worked together to further the enterprise by and among the following manner and means:

a.  jointly planning to deceptively market and manufacture opioids that were purportedly non-addictive, safe, and effective for the treatment of chronic pain;
b.  concealing the addictive qualities of the opioids from prescribers and the public;
c.  misleading the public about the addictive quality and safety and efficacy of opioids;
d.  otherwise misrepresenting or concealing the highly dangerous nature of opioids from prescribers and the public;
e.  illegally marketing, selling, and/or distributing opioids;
f.  ensuring that public and private payors paid for, reimbursed, or otherwise covered highly addictive opioids and made non-addictive or less-addictive pain relief treatments as well as addiction treatment less readily available;
g.  collecting revenues and profits from the sale of such products for uses for which they are unapproved, unsafe, or ineffective; and/or
h.  failing to report suspicious sales as required by the CSA.

265.    To achieve their common goals, Defendants hid from the general public the full extent of the unsafe and ineffective nature of opioids for chronic pain as described herein.

Defendants further suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the addictive, unsafe, and often ineffective nature of opioids.

266.    The foregoing acts demonstrate that Defendants were part of an association of entities that shared a common purpose, had relationships across the various members of the enterprise, and collaborated to further the goals of the enterprise for a continuous period of time. The Manufacturer Defendants knowingly and intentionally engaged in deceptive marketing practices, and incentivized pain foundations, marketing firms, and physicians to do so as well, the Distributor Defendants knowingly and intentionally failed to report suspicious orders as required by state and federal law and inundated the market with opioids, and the PBM Defendants knowingly and intentionally designed their customers' formularies to ensure that the maximum number of Manufacturers' opioids were prescribed and sold.

### (b)    Mail and Wire Fraud

267.    To carry out and attempt to carry out the scheme to defraud, Defendants, each of whom is a 'person' associated in fact with the enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

268.    Specifically, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343) within the past four years. The multiple acts of racketeering activity which Defendants committed, or aided and abetted in the commission of, were related to each other and also posed a threat of continued racketeering activity. They therefore constitute a

"pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the enterprise. Defendants participated in the scheme to defraud by using the mail, telephone, and Internet to transmit mailings and wires in interstate or foreign commerce.

269. In devising and executing the illegal scheme, Defendants devised and knowingly carried out a material scheme and/or artifice to defraud regulators, prescribers, and the public to obtain money from Springfield by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, Defendants committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

270. Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include, but are not limited to:

   a. Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to deceptively market, sell, and distribute the opioids by means of false pretenses, misrepresentations, promises, and omissions; and
   b. Wire Fraud: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

271. Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, and shipment of deceptive marketing materials, the filling of suspicious orders and the misleading of regulators and the public as to Defendants' compliance with their state and federal reporting obligations. These materials would not have been delivered, orders would not have been filled, and regulators would have not been misled but for Defendants' illegal scheme, including, but not limited to:

a. publication of opioid prescribing guidelines entitled "Responsible Opioid Prescribing: A Physician's Guide," by Fishman, published by the Federation of State Medical Boards (FSMB);

b. the FSMB's publication of "Responsible Opioid Prescribing: A Clinician's Guide (Second Edition, Revised and Expanded)," by Fishman;

c. the American Pain Foundation's (APF) publication of Exit Wounds[71];

d. the American Academy of Pain Medicine's (AAPM) "consensus statement" and educational programs featuring Fine;

e. the American Psychological Association's (APA) publication and dissemination of "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse";

f. false or misleading communications to the public and to regulators;

g. failing to report suspicious orders as required by state and federal law;

h. sales and marketing materials, including slide decks, presentation materials, purported guidelines, advertising, web sites, product packaging, brochures, labeling, and other writings which misrepresented, falsely promoted, and concealed the true safety and effectiveness of opioids;

i. documents intended to facilitate the manufacture and sale of opioids, including bills of lading, invoices, shipping records, reports, and correspondence;

j. documents to process and receive payment for opioids, including invoices and receipts;

k. payments to the foundations and physicians that deceptively marketed the Manufacturer Defendants' opioids;

l. deposits of proceeds; and

m. electronic communications.

272.    Defendants also used the internet and other electronic facilities to carry out the scheme and conceal ongoing fraudulent activities.  For example, the Manufacturer Defendants made misrepresentations about opioids on their websites, YouTube, and through online ads, all of which were intended to mislead prescribers and the public about the safety, efficacy, and non-addictiveness of opioids.

273.    Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various affiliates, regional offices, divisions, distributors, regulators,

---

[71] The American Pain Foundation dissolved in 2012, after an investigation found that 90% of its funding came from pharmaceutical and medical-device industry, and that the group's materials downplayed the risks associated with opioid use. *See* "American Pain Foundation Closes After Senators Launch Investigation of Drugmakers," May 10, 2012, http://philanthropynewsdigest.org/news/american-pain-foundation-closes-after-senators-launch-investigation-of-drugmakers (last viewed April 30, 2018).

and other third-party entities in furtherance of the scheme. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive prescribers, consumers, and regulators, oversupply the market, and fail to report suspicious sales.

274.     Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities are concealed from Springfield, and cannot be alleged without access to Defendants' books and records. However, Springfield has described the types of predicate acts of mail and/or wire fraud that occurred. The secretive nature of the enterprise's activities made the unlawful tactics discussed herein even more deceptive and harmful.

275.     The foregoing allegations support that: the Manufacturer Defendants engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceptively market their products through the use of both print and electronic outlets; and all Defendants engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceive regulators and oversupply the market while failing to report suspicious sales.

**(c)     Conspiracy Allegations**

276.     Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.

277.     Defendants conspired to incentivize and encourage various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants in this complaint, to carry out offenses and other acts in furtherance of the conspiracy. Defendants conspired to increase or maintain revenues, increase market share, and/or minimize losses for the

Defendants and their other collaborators throughout the illegal scheme and common course of conduct.

278.    In order to achieve their goal, Defendants engaged in the aforementioned predicate acts on numerous occasions.  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in defectively marketing and/or selling opioids through the use of mail and wire fraud.

279.    Indeed, for the conspiracy to succeed, each of the Defendants had to agree to deceptively market, sell, authorize, and/or distribute opioids while failing to report suspicious sales.  The unanimity of the Manufacturer Defendants' marketing tactics and all Defendants' failure to report suspicious sales gave credence to their misleading statements and omissions to prescribers, consumers, and regulators, and directly caused opioids to inundate the Springfield market.

280.    Defendants knew and intended that government regulators, prescribers, consumers, and others, including Springfield, would rely on the collective material misrepresentations and omissions made by them and the other enterprise members about opioids and suspicious sales. Defendants knew and recklessly disregarded the cost that would be suffered by the public, including Springfield.

281.    The Manufacturer Defendants knew that by partnering with the pain foundations and individual physicians who carried a more neutral public image, they would be able to attribute more scientific credibility to their products, thereby increasing their sales and profits.

282.    The Manufacturer and PBM Defendants also knew that they would not have succeeded absent the PBM's preferred placement of opioids on their customers' formularies. The

formularies controlled which opioids were paid for, reimbursed, and covered by public and private payors. If opioids were not given preferred placement on formularies, they would not have been widely sold.

283. Defendants also knew that by filling and failing to report suspicious sales, they would significantly increase their sales and profits.

284. The foregoing illustrates Defendants' liability under 18 U.S.C. § 1962(d), by engaging in their pattern of racketeering and conspiring to achieve their common goal of maximizing opioid sales.

**(d)     Effect on Springfield**

285. As described herein, Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from consumers, based on misrepresentations and omissions. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events. The predicate acts all had the purpose of generating significant revenue and profits for Defendants, at the expense of Springfield. The predicate acts were committed or caused to be committed by Defendants through their participation in the enterprise and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Springfield's and its residents' funds.

286. As fully alleged herein, Springfield relied upon representations and omissions that were made or caused by Defendants. Plaintiff's reliance is evidenced by the fact that they purchased opioids which never should have been introduced into the U.S. stream of commerce and whose use has now caused a nationwide epidemic of addiction and overdose.

287.     Springfield's injuries were proximately caused by Defendants' racketeering activity, which directly caused over-prescription, over-purchase, and over-consumption of opioids. But for Defendants' misstatements and omissions and the scheme employed by the Opioid Fraud Enterprise, Springfield would not have paid for opioid prescriptions for chronic pain and would not be bearing the costs of its current opioid epidemic.

288.     By reason of, and as a result of the conduct of each of the Defendants, and in particular, their pattern of racketeering activity, Springfield has been injured in its business and property in multiple ways, including, but not limited to:

   a. increased healthcare costs;
   b. increased incidence of NAS and costs associated with resulting need for hospitalization and care of NAS affected infants;
   c. increased expenditure on emergency healthcare and medical services;
   d. lost value of productive and health community members and City employees;
   e. increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the City;
   f. increased availability of drugs for criminal use and resulting increase in crime;
   g. increased incidence of heroin addicts who progressed from opioids to the use of heroin;
   h. increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to crime;
   i. general interference with the enjoyment of life in Plaintiff's community;
   j. increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, and probation; and
   k. increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

289.     Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Defendants' actions.

290. Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' racketeering activity. Plaintiff does not seek damages for physical injury, mental anguish, or emotional harm, or any physical damages to property caused by Defendants' actions.

291. Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Springfield, and Springfield is entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III
## NEGLIGENCE
## (DISTRIBUTOR DEFENDANTS)

292. Plaintiff incorporates by reference the allegations in paragraphs 1 through 229.

293. Missouri recognizes a legal duty where the foreseeability of harm is such that harm may result if due care is not exercised. In any action for negligence, the plaintiff must establish the existence of a duty on the part of the defendant to protect the plaintiff from injury, failure of the defendant to perform the duty, and that the plaintiff's injury was proximately caused by that failure. *Krause v. U.S. Truck Co., Inc.*, 787 S.W. 2d 708, 710 (Mo. 1990). A duty is owed to a person within an "orbit of danger as disclosed to the eye of reasonable vigilance." *Id.* (citing *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339 (1928).

294. Each of the Distributor Defendants engaged in negligent practices by omitting the material fact of its failure to design and operate a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders, as required of "registrants" by the federal CSA, 21 C.F.R. § 1301.74(b). The CSA defines "registrant" as any

person who is registered pursuant to 21 U.S.C. § 823. 21 C.F.R. § 1300.02(b). Section 823(a)-(b) requires manufacturers and distributors of controlled substances on Schedule II to register.

295.     In addition to federal regulations, each Distributor Defendant had a duty to abide by Missouri law, which requires the establishment of written policies and procedures for identifying, recording, and reporting losses or thefts and for correcting errors and inaccuracies in inventory. 20 CSR 2220-5.030(3)(M). Distributor Defendants have a state-law duty to report suspicions of diversion or theft. 20 CSR 2220-5.030(3)(M)(5). Additionally, any suspected criminal activities or diversion is required to be reported. 20 CSR 2220-5.030(3)(M)(5), (7).

296.     Each Distributor Defendant here owed a duty to Springfield based on the unique position they had as the most knowledgeable parties regarding addiction rates of drugs distributed to Springfield, the quantities of opioids distributed to Springfield, the legitimacy or lack thereof of the need for the quantity of opioids ordered by and distributed to Springfield pharmacies when compared to national statistics regarding opioid use and population comparison, the market for opioids when compared to population of the town, and the legitimacy or lack thereof with regard to the prescriptions for opioids being submitted to pharmacies in Springfield.

297.     Distributor Defendants are distributors of controlled substances and must comply with state and federal laws, as well as with industry customs and standards developed in large part by these particular Distributor Defendants.

298.     Distributor Defendants negligently failed to ensure their conduct conformed to Missouri law and regulations.

299.     Industry standards require these Defendants to:

    a.   know its customers;
    b.   know its customer base;
    c.   know the population base served by a particular pharmacy or drug store;
    d.   know the average prescriptions filled each day;

e. know the percentage of diverted and/or abused controlled substances distributed as compared to overall purchases;

f. have a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes; and

g. know the identification of the physicians and bogus pain clinics and centers for the alleged treatment of pain that are the pharmacy or drug stores' most frequent prescribers.

300. Distributor Defendants negligently turned a blind eye to the foregoing factors by regularly distributing large quantities of commonly abused, highly-addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were or reasonably could be expected to become addicted or engaged in illicit drug transactions.

301. Distributor Defendants took no action, or a minimum insufficient action, to stem the flow of opioids into the hands of abusers, misusers, and diverters in Springfield.

302. Each Distributor Defendant knew that the dangerous qualities of their opioid drugs bore a direct relationship to the volume of opioids being prescribed and ordered by pharmacies and prescribers in Springfield, and that the opioid drugs were being misused, abused, and diverted in Springfield.

303. Each Distributor Defendant knew or should have known of the reasonable foreseeability of injure and damage to Springfield, caused by the known and foreseeable misuse, overuse, abuse, and diversion of the opioid drugs in their control.

304. Each Distributor Defendant owed Plaintiff a duty to use reasonable care when distributing opioids in Springfield.

305. Plaintiff has suffered unique damages as a result of Distributor Defendants' Negligence. This harm includes, but is not limited to:

a. increased healthcare costs;

b. increased incidence of NAS and costs associated with resulting need for hospitalization and care of NAS affected infants;

    c.  increased expenditure on emergency healthcare and medical services;

    d.  lost value of productive and health community members and City employees;

    e.  increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the City;

    f.  increased availability of drugs for criminal use and resulting increase in crime;

    g.  increased incidence of heroin addicts who progressed from opioids to the use of heroin;

    h.  increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to crime;

    i.  general interference with the enjoyment of life in Plaintiff's community;

    j.  increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, and probation; and

    k.  increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

306.    Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Distributor Defendants' actions.

307.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity and fraudulent misrepresentations.  Plaintiff does not seek damages for physical injury, mental anguish, or emotional harm, or any physical damages to property caused by Defendants' actions.

308.    The aforementioned conduct was a direct breach of the duty Distributor Defendants owed to Plaintiff, and this breach was the proximate cause of Plaintiff suffering damages.

**COUNT IV**
**NEGLIGENCE**
**(MANUFACTURER DEFENDANTS)**

309.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 229.

310.    Missouri recognizes a legal duty where the foreseeability of harm is such that harm may result if due care is not exercised.  In any action for negligence, the plaintiff must establish

the existence of a duty on the part of the defendant to protect the plaintiff from injury, failure of the defendant to perform the duty, and that the plaintiff's injury was proximately caused by that failure. *Krause v. U.S. Truck Co., Inc.*, 787 S.W. 2d 708, 710 (Mo. 1990). A duty is owed to a person within an "orbit of danger as disclosed to the eye of reasonable vigilance." *Id.* (citing *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339 (1928).

311.    Each of the Manufacturer Defendants engaged in negligent practices by omitting the material fact of its failure to design and operate a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders, as required of "registrants" by the federal CSA, 21 C.F.R. §1301.74(b). The CSA defines "registrant" as any person who is registered pursuant to 21 U.S.C. § 823. 21 C.F.R. § 1300.02(b). Section 823(a)-(b) requires manufacturers and distributors of controlled substances on Schedule II to register with the DEA, while state statutes require similar registration with the Board of Pharmacy.

312.    The information available to Manufacturer Defendants enabled them to predict this Opioid Epidemic. Instead, they hid behind certifications and approvals by government agencies, disguised their acts as lawful behavior, influenced the medical decision making of prescribers, and failed to recognize the legal duty that arose to municipalities like Springfield along the way.

313.    Because of the inherent high risks associated with opioid use and the unique position by Manufacturer Defendants as most knowledgeable regarding the risk of use of opioids, Manufacturer Defendants owed a duty to use reasonable care in their actions with regarding to opioid marketing, sale, and distribution. The sheer dangerousness of these drugs, including the known substantial threat of abuse and diversion, created a legal duty owed to Springfield, where the drug would be distributed and consumed.

314.     Indeed, the Manufacturer Defendants owed a duty to Plaintiff in the marketing and sale of their highly addictive opioids.  Each Manufacturer Defendant owed Plaintiff a duty to use reasonable care when marketing and selling drugs which would be ultimately distributed in Springfield.  Each Manufacturer Defendant owed Plaintiff a duty to use reasonable care when marketing and selling drugs in Springfield.

315.     Each Manufacturer Defendants knew their marketing was a substantial factor in the prescribing, purchasing, and use of opioids in Springfield.

316.     Each Manufacturer Defendants knew the unreasonably dangerous qualities of their opioids and that said drugs were highly addictive and highly susceptible to abuse and diversion.

317.     While explicit standards applicable to the manufacture, advertising, labeling, distribution, and sale of opioids exist to control addiction, abuse, and diversion of opioids, a broader, general duty exists for the manufacturers and distributors of these drugs, namely the Manufacturer Defendants herein, to exercise due care when marketing and distributing the drugs.

318.     Each Manufacturer Defendant knew that the dangerous qualities of their opioids bore a direct relationship to the volume of opioids being prescribed and ordered by pharmacies and prescribers in Springfield, and that their opioids were being misused, abused, and diverted across the country, including in Springfield.

319.      Each Manufacturer Defendant knew or should have known of the reasonable foreseeability of injury and damage to American communities, including Springfield, caused by the known and foreseeable misuse, overuse, abuse, and diversion of the opioids they manufactured and sold.

320.     Despite this knowledge and the existing legal duty, Manufacturer Defendants, breached said duty by:

a.  Negligently marketing their opioids in Springfield;
b.  Misrepresenting the addiction, abuse, and diversion potential and rates associated with their drugs;
c.  Publishing misleading information regarding the benefits of long-term opioid use while understating the lack of evidence supporting long-term opioid use and the downfalls associated with the same;
d.  Trivializing the serious risks associated with long-term opioid use, including addiction, abuse, diversion, overdose, and death;
e.  Publishing misleading information overstating the superiority of long-term opioid use when compared to alternative treatment methods including conservative treatment and non-opioid treatment;
f.  Misleading prescribers, consumers, and communities regarding addiction rates, difficulties associated with withdrawal, and prevalence of withdrawal symptoms;
g.  Marketing opioids for unintended uses, and publishing misleading information;
h.  Failing to implement reasonable controls and safeguards to identify and prevent or reduce the misuses, abuse, and diversion of their opioids;
i.  Failing to comply with reporting requirements;
j.  Having conscious disregard for suspicious orders;
k.  Negligently raising quotas and/or distributing opioids where there could be no legitimate use for the opioids being ordered;
l.  Negligently raising quotas and/or distributing opioids where the ratio of dose per person in the relevant community, including Springfield, exceeded any national norm or average of opioid usage; and
m.  Acting with conscious disregard for the consumers and communities, including Springfield, with the sole goal of maximizing market potential and profits.

321.    These Manufacturer Defendants' breach of the duty owed to Springfield directly and proximately caused harm to Springfield. Springfield suffers and continues to suffer injury and damages including, but not limited to:

a.  increased healthcare costs;
b.  increased incidence of NAS and costs associated with resulting need for hospitalization and care of NAS affected infants;
c.  increased expenditure on emergency healthcare and medical services;
d.  lost value of productive and health community members and City employees;
e.  increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the City;
f.  increased availability of drugs for criminal use and resulting increase in crime;
g.  increased incidence of heroin addicts who progressed from opioids to the use of heroin;

h.  increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to crime;

i.  general interference with the enjoyment of life in Plaintiff's community;

j.  increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, and probation; and

k.  increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

322.  Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Distributor Defendants' actions.

## COUNT V
## NEGLIGENCE
## (PBM DEFENDANTS)

323.  Plaintiff incorporates by reference the allegations in paragraphs 1 through 229.

324.  Missouri recognizes a legal duty where the foreseeability of harm is such that harm may result if due care is not exercised.  In any action for negligence, the plaintiff must establish the existence of a duty on the part of the defendant to protect the plaintiff from injury, failure of the defendant to perform the duty, and that the plaintiff's injury was proximately caused by that failure.  *Krause v. U.S. Truck Co., Inc.*, 787 S.W. 2d 708, 710 (Mo. 1990).  A duty is owed to a person within an "orbit of danger as disclosed to the eye of reasonable vigilance."  *Id.* (citing *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339 (1928).

325.  The information available to PBM Defendants enabled them to predict the Opioid Epidemic.  Collectively, the PBM Defendants gathered information regarding nearly all opioid prescriptions filled in Springfield to authorize reimbursement for those prescriptions by private and public payors.

326.     Each PBM Defendant owed a duty to Springfield based on the unique position each PBM Defendant held with respect to their knowledge of the prescribers, pharmacies, or patients who were prescribing, dispensing, or using opioids unsafely or fraudulently, and their ability to authorize such prescriptions for reimbursement.

327.     The PBM Defendants took no action, or insufficient action to stem the flow of opioids into the hands of abusers, misusers, and diverters in Springfield.

328.     Each PBM Defendant knew that the dangerous qualities of their opioid drugs bore a direct relationship to the volume of opioids being prescribed and filled by pharmacies and prescribers in Springfield, and that the opioid drugs were being misused, abused, and diverted across the country, including in Springfield.

329.     Each PBM Defendant knew or should have known of the reasonable foreseeability of injury and damage to American communities, including Springfield, caused by the known and foreseeable misuse, overuse, abuse, and diversion of the opioid drugs, access to which was within their control.

330.     The PBM Defendants placed their profit motives above their duty of care and enabled, encouraged, and caused the over-prescribing and distribution of opioids.

331.     Each PBM Defendant owed Plaintiff a duty to use reasonable care when authorizing opioids for reimbursement in and around Springfield.

332.     Plaintiff has suffered and will continue to suffer devastating consequences as a result of the PBM Defendants' actions.  The damages incurred by Plaintiff, include but are not limited to money expended on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, probation, public welfare and service agencies, emergency healthcare and medical services, drug

abuse education and treatment, public utilities, nuisance abatement, property damage repair, and code enforcement, among others.

333.    Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by PBM Defendants' actions.

334.    The aforementioned conduct was a direct breach of the duty PBM Defendants owed to Plaintiff which was the proximate cause of Plaintiff suffering damages.

## COUNT VI
## PUBLIC NUISANCE
## (ALL DEFENDANTS)

335.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 229.

336.    A public nuisance is an "unreasonable interference with a right common to the general public" that results from unlawfully committing any act or omitting to perform a duty that the public health requires.  *State ex rel. Dresser Industries, Inc. v. Ruddy*, 592 S.W.2d 789, 792 (Mo. banc 1980) (quoting R2d Torts § 821B(1) at 87 (1977)), *State by Major ex rel. Hopkins v. Excelsior Powder Mfg. Co.*, 169 S.W. 267, 273 (1914).  Public rights include "the public health, the public safety, the public peace, the public comfort or the public convenience." *City of St. Louis v. Varahi, Inc.*, 39 S.W. 3d 531, 536 (Mo. Ct. App. 2001) (citing R2d Torts § 821B(2)(a)).  Public nuisance becomes a private tort when a person shows a particularized damage not shared with the rest of the public.  *Id.* (internal citations omitted), *Kelly v. Boys' Club of St. Louis, Inc.*, 588 S.W. 2d 254, 256-57 (E.D. Mo. 1979).

337.    All Defendants, individually and acting through their employees and agents, have created and continue to perpetuate and maintain a public nuisance to the residents of Springfield

through the massive sale and distribution of millions of doses of highly addictive and commonly abused prescription opioids.

338.     Defendants' conduct has unreasonably interfered with rights common to the general public, including public health, safety, peace, morals, and convenience.

339.     Defendants' conduct causing this interference is proscribed by statute, ordinance, or administrative regulation, including, but not limited to, Chapters 7, 8, and 9 of Division 60 of Title 15 of the Missouri Code of State Regulations.

340.     Manufacturer Defendants misrepresented the safety and effectiveness of opioids for the treatment of chronic pain, directly, through their control of third parties, and by acting in concert with third parties.

341.     Manufacturer and Distributor Defendants' conduct includes the failure to put in place effective controls and procedures to guard against theft and diversion of opioids; to adequately design and operate a system to disclose suspicious orders of opioids; and to report suspicious orders when suspected or discovered.

342.     Manufacturer and Distributor Defendants also enabled and/or failed to prevent the illegal diversion of opioids into the black market, including through drug rings, pill mills, and other dealers in Springfield, with actual knowledge, intent, and/or reckless or negligent disregard that such pills would be illegally trafficked and abused.

343.     The Manufacturer Defendants knowingly and intentionally financially incentivized the PBM Defendants to place their opioids on the PBMs formularies irrespective of medical necessity, resulting in widespread and unnecessary overuse.

344.     The PBM Defendants knowingly and intentionally chose to include on their formularies and make readily available opioids that were more addictive than other pain relievers

because they generated greater profits. This choice led directly to the increased likelihood of addiction by patients who held insurance that utilized the PBM.

345. The PBM Defendants knowingly and intentionally chose to include non-ADF opioids, which were easier to misuse (for example, by crushing them into powder and mixing them with liquid in order to inject them) instead of ADF opioids, which tended to be more expensive. This choice directly led to the ease with which the opioids were misused.

346. The PBM Defendants knowingly and intentionally made it more expensive or more difficult to obtain efficacious non-opioid medications for pain. These choices led directly to the increased sale and use of opioids, and the resulting misuse and addiction by patients whose insurance use the PBM for administration of drug benefits.

347. The PBM Defendants knowingly and intentionally made it more expensive or more difficult to obtain non-opioid medications that were known to be efficacious for pain. This led directly to the increased sale and use of opioids by patients whose insurance use the PBM for administration of drug benefits.

348. The PBM Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses and treat opioid addiction or made such medications more difficult or expensive to obtain.

349. The PBM Defendants knowingly and intentionally created formularies that enabled an excessive number of pills to be made available to by patients whose insurance use the PBM for administration of drug benefits for use and abuse.

350. Notwithstanding knowledge of this epidemic of opioid abuse across the country and specifically in Springfield, Defendants persisted in a pattern and practice of manufacturing, promoting, distributing, and authorizing opioids for the treatment of chronic pain, controlled

substances of kinds which were well-known to be abused and diverted in such quantities and with such frequency that the Defendants knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes.

351.    Defendants' actions created a new secondary market for opioids — providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' actions is not only an explosion of prescription opioids on the black market, but also a marked increase in the use of heroin.

352.    Defendants' conduct set in motion a chain of events that resulted in the invasion of public rights.  Without the Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid abuse and addiction that now exists would have been averted.

353.    The effects of Defendants' conduct are not insubstantial or fleeting.  Indeed, Defendants' unlawful conduct has so severely impacted public health on every geographic and demographic level that the public nuisance perpetrated by Defendants' conduct is commonly referred to as a "crisis" or an "epidemic."  It has cost people their lives and livelihoods, and otherwise caused serious injuries and a severe disruption of public peace, order, and safety.

354.    Plaintiff has sustained economic harm in the expenditure of massive sums of monies to respond to and combat this public nuisance.  Additionally, because public resources are being consumed in efforts to address the Opioid Epidemic, fewer resources are available to be used to benefit the public at large in Springfield.

355.    Defendants' conduct is of a continuing nature and has produced and will continue to produce permanent or long-lasting harm to Springfield.

356. Defendants knew or should have known that their conduct would cause harm to Springfield. Defendants misrepresented the benefits of opioids for the treatment of chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs, with the goal of expanding the market for opioids.

357. Furthermore, Defendants knew or should have known their conduct would cause harm to Springfield as a result of the large amount of media coverage of prescription drug abuse and its consequences by both national and local print, television, and radio media; publications received from government sources as well as warnings and recommendations contained in trade and professional journals; changes in law and regulations which were designed specifically to address the growing problem of opioid abuse and addiction; and the data collection and analytics used by Defendants.

358. Defendant' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. The rights, interests, and inconvenience to Springfield and the general public far outweigh the rights, interests, and inconvenience to Defendants, which profited from the illegal diversion, abuse, misuse, and negligent proliferation of opioids.

359. The damages suffered by Plaintiff include, but are not limited to:

   a. increased healthcare costs;
   b. increased incidence of NAS and costs associated with resulting need for hospitalization and care of NAS affected infants;
   c. increased expenditure on emergency healthcare and medical services;
   d. lost value of productive and health community members and City employees;
   e. increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the City;
   f. increased availability of drugs for criminal use and resulting increase in crime;
   g. increased incidence of heroin addicts who progressed from opioids to the use of heroin;

h.  increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to crime;

i.  general interference with the enjoyment of life in Plaintiff's community;

j.  increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, and probation; and

k.  increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

360.  Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Defendants' actions.

361.  Defendants had reasonable anticipation of the harm described above and failed to exercise reasonable care to avert such harm. *See Kelly*, 588 S.W. 2d at 257.

362.  The public nuisance created, perpetuated, and maintained by Defendants can be abated and further occurrence of such harm and inconvenience can be prevented. Springfield is entitled to abate the public nuisance and to obtain damages occasioned by the public nuisance.

## COUNT VII
## FRAUD
## (MANUFACTURER DEFENDANTS)

363.  Plaintiff incorporates by reference the allegations in paragraphs 1 through 229.

364.  Manufacturer Defendants, individually and acting through their employees and agents, and in concert with each other, made false representations and omissions of facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids for the treatment of chronic pain as set forth in detail herein. These misrepresentations included publishing false and misleading information regarding the benefits of long-term opioid use while understating the lack of evidence supporting long-term opioid use and the downfalls associated with the same.

365.    Manufacturer Defendants knew or reasonably should have known that the representations made regarding the safety and effectiveness of opioids for the treatment of chronic pain were false or incomplete and misrepresented material facts.

366.    Manufacturer Defendants committed fraud representing compliance with state and federal regulations while failing to implement reasonable controls and safeguards to identify and prevent or reduce the misuses, abuse, and diversion of their opioids and failing to comply with reporting requirements.

367.    Manufacturer Defendants willfully, knowingly, and deceptively withheld and misrepresented material facts regarding the safety and effectiveness of opioids for the treatment of chronic pain from Plaintiff, prescribers, and consumers.

368.    Manufacturer Defendants intended that Plaintiff and its residents would rely on their representations and omissions and act upon them, so to expand the market for opioids and increase their revenues related to the sale of opioids.

369.    Plaintiff and its residents reasonably relied on the representations and omissions made by Manufacturer Defendants, ignorant of the falsity of Manufacturer Defendants' representations.

370.    Plaintiff and its residents had a right to rely on Manufacturer Defendants to educate them as to the risks and benefits associated with opioid use.  Manufacturer Defendants had superior knowledge, information, and expertise that was not within the fair and reasonable reach of Plaintiff and its residents.

371.    As a proximate and legal result of Manufacturer Defendants' fraudulent misrepresentations, Plaintiff paid for the cost of opioids to treat chronic pain, including through its self-funded health care and workers' compensation plans.  Plaintiff also paid for costs and

otherwise suffered losses resulting from its insureds' and its residents' opioid dependence, abuse, and addiction.

372.     By reason of their reliance on Manufacturer Defendants' misrepresentations and omissions of material fact, Plaintiff suffered and will continue to suffer actual injury.  Plaintiff is therefore entitled to recover those damages.

373.     The damages suffered by Plaintiff include, but are not limited to:

   a.  increased healthcare costs;
   b.  increased incidence of NAS and costs associated with resulting need for hospitalization and care of NAS affected infants;
   c.  increased expenditure on emergency healthcare and medical services;
   d.  lost value of productive and health community members and City employees;
   e.  increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the City;
   f.  increased availability of drugs for criminal use and resulting increase in crime;
   g.  increased incidence of heroin addicts who progressed from opioids to the use of heroin;
   h.  increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to crime;
   i.  general interference with the enjoyment of life in Plaintiff's community;
   j.  increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, and probation; and
   k.  increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

374.     Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Manufacturer Defendants' actions.

## COUNT VIII
## CIVIL CONSPIRACY
## (ALL DEFENDANTS)

375.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 229.

376.    All Defendants agreed to engage in a campaign to flood the market with false and misleading information about the safety of prescription opioid use for the treatment of chronic pain, to evade controls on opioid diversion, to increase opioid quotas, and to promote their use through formulary placements, not requiring pre-authorization and not promoting less addictive alternatives.

377.    The Defendants engaged in the conspiracy an effort to profit off the increased sales of prescription opioids.

378.    To effectuate their goal of maximizing the number of opioid users and their revenues and profits at all costs, Defendants engaged in a sophisticated, well-developed, and fraudulent scheme designed to increase the prescription rate for the sale and distribution of the Defendants' opioids and to popularize the misunderstanding that opioids are effective for chronic pain and that the risk of addiction is low.

379.    The Manufacturer Defendants engaged in a coordinated effort to deceive the American public and the medical profession about the efficacy and safety of opioids, including by minimizing the addictive qualities of opioids.

380.    The Manufacturer and PBM Defendants further conspired to increase the use of the least expensive, most addictive opioids by controlling the drugs' placement on formularies. The respective formularies controlled which opioids were paid for, reimbursed, and covered by public and private insurers. The Manufacturer and PBM Defendants coordinated to ensure that the maximum number of Manufacturers' opioids were prescribed and sold and that the PBM Defendants received maximum profits at the expense of patients.

381.    All of the Defendants then refused to identify, investigate, report, or otherwise block suspicious prescriptions and orders despite their actual knowledge of suspicious

prescriptions and drug diversion rings. In doing so, the Defendants worked together to ensure that opioid production quotas continued to increase, allowing them to generate more and more profits.

382.     The formation, existence, and actions of the conspiracy described herein were essential to the success of Defendants' campaign to increase and maintain profits from unlawful sales of opioids. The conspirators were aware that, unless they agreed to act and acted jointly, sales of prescription opioids would substantially decrease, and accordingly, the profits would substantially diminish.

383.     At all relevant times, each Defendant was aware of the conspiracy, was a knowing and willing participant in the conduct of the conspiracy, and received substantial revenue from the conspiracy, in the form of sales for Manufacturer Defendants, sales and kickbacks for Distributor Defendants who reached particular monthly goals, and rebates or other financial incentives for PBM Defendants who placed opioids in a preferred place on a formulary or otherwise ensured opioids were widely sold.

384.     Such revenue was exponentially greater than it would have been had opioids been responsibly marketed and the true efficacy and safety risks of prescription opioids disclosed.

385.     Springfield was directly and proximately harmed by the Defendants' civil conspiracy. Plaintiff paid for the cost of opioids to treat chronic pain, including through its self-funded health care and workers' compensation plans. Plaintiff also paid for costs and otherwise suffered losses resulting from its insureds' and its residents' opioid dependence, abuse, and addiction in an amount to be determined in this litigation.

386.     The damages suffered by Plaintiff include, but are not limited to:

   a.   increased healthcare costs;
   b.   increased incidence of NAS and costs associated with resulting need for hospitalization and care of NAS affected infants;
   c.   increased expenditure on emergency healthcare and medical services;

d. lost value of productive and health community members and City employees;
e. increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the City;
f. increased availability of drugs for criminal use and resulting increase in crime;
g. increased incidence of heroin addicts who progressed from opioids to the use of heroin;
h. increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to crime;
i. general interference with the enjoyment of life in Plaintiff's community;
j. increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, and probation; and
k. increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

387. Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Distributor Defendants' actions.

**COUNT IX**
**UNJUST ENRICHMENT**
**(ALL DEFENDANTS)**

388. Plaintiff incorporates by reference the allegations in paragraphs 1 through 229.

389. Unjust enrichment requires that Defendants were enriched by the receipt of a benefit, that the enrichment was at the expense of the plaintiff, and that it would be unjust to allow Defendants to retain the benefit. *Ernst v. Ford Motor Co.*, 813 S.W. 2d 910, 918 (Mo. App. W.D. 1991), *American Standard Ins. Co. of Wisconsin v. Bracht*, 103 S.W. 3d 281, 291 (Mo. App. S.D. 2003). The damages suffered turn on the benefit conferred upon Defendants. *American Standard*, 103 S.W. 3d at 292.

390.     Defendants have unjustly retained benefits to Plaintiff's detriment, and the Defendants' retention of these benefits violates the fundamental principles of justice, equity, and good conscience.

391.     First, by illegally and deceptively promoting opioids to treat chronic pain, directly, through their control of third parties, and by acting in concert with third parties, Defendants have benefited themselves at Plaintiff's expense.

392.     Plaintiff has made payments for opioids prescribed for the treatment of chronic pain, and Defendants knowingly benefited from those payments, either by directly receiving such payments or by receiving fees, rebates, and/or other forms of compensation in connection with the purchase and sale of opioids for the treatment of chronic pain.

393.     Plaintiff would not have made these payments and Defendants would not have received these benefits in the absence of Defendants' deceptive promotion of opioids as described in this Complaint.

394.     It is unjust for Defendants to retain benefits resulting from these payments.

395.     Second, Defendants have unjustly benefited from Plaintiff's shouldering of the external costs of the Opioid Epidemic resulting from Defendants' illegal and deceptive promotion of opioids for chronic pain.  Benefits may take "any form of advantage," including when a person "satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage." R1st Restitution, § 1, cmt b.

396.     Defendants know of, or have reason to know of, and have been advantaged by Plaintiff's bearing of the external costs of the Opioid Epidemic.

397.     It is unjust for Defendants to retain the benefits conferred by Plaintiff's bearing of the external costs caused by the Opioid Epidemic.

398.     Collectively, Defendants made and continue to make substantial profits while fueling the prescription drug epidemic in Springfield.

399.     Plaintiff seeks restitution in the amount of the benefit conferred upon Defendants for the business conducted by them in Springfield, including but not limited to the profits received by Defendants stemming from their irresponsible and unlawful conduct.  This includes, but is not limited to, any rebates, incentives, or other fees, received by PBMs for the authorization of opioids for chronic pain therapy.

400.     As a matter of equity, Defendants should be required to disgorge all unjust enrichment to Springfield.

## **PRAYER**

WHEREFORE, Plaintiff prays that the Court grant the following relief:

1.     Order a jury trial on all issues so triable to determine damages as a result of the all Defendants' actions outlined in this Complaint;

2.     Enter Judgment in favor of Plaintiff;

3.     Enter a temporary restraining order which:

   a.   Prevents all Defendants from continuing to violate Missouri laws;

   b.   Mandates that Distributor Defendants promptly notify the appropriate authorities of any and all suspicious orders for controlled substances as received from parties who are located in Springfield;

   c.   Mandates Distributor Defendants submit their system for determining suspicious orders to those Missouri authorities for prior approval, and to enjoin Distributor Defendants from distributing any opioid in Springfield for any illegitimate medical purpose;

   d.   Mandates Manufacturer, Distributor, and PBM Defendants provide Plaintiff with the assistance necessary to address the addiction and the resulting destruction left by Defendants' actions to abate the damage they have caused and are continuing to cause; and

e. Otherwise abates the public nuisance caused in whole or in part by Defendants' actions.

4. Enter a permanent restraining order which:

a. Prevents Defendants from continuing to violate Missouri laws;

b. Mandates that Distributor Defendants promptly notify the appropriate authorities of any and all suspicious orders for controlled substances as received from parties who are located in Springfield;

c. Mandates Distributor Defendants submit their system for determining suspicious order to those Missouri authorities for prior approval, and to enjoin Defendants from distributing any opioid in Springfield for any illegitimate medical purpose;

d. Mandates Manufacturer, Distributor, and PBM Defendants provide Plaintiff with the assistance necessary to address the addiction and the resulting destruction left by Defendants' actions to abate the damage they have caused and are continuing to cause; and

e. Otherwise abates the public nuisance caused in whole or in part by Defendants.

5. Order equitable relief, including, but not limited to restitution and disgorgement;

6. Award punitive damages for Defendants' willful, wanton, malicious, oppressive, and intentional actions as detailed herein;

7. Award attorneys' fees and costs; and

8. Award such other relief as this Court deems just and fair;

PLAINTIFF SEEKS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE.

TURNER, REID, DUNCAN, LOOMER
     & PATTON, P.C.
1355 East Bradford Parkway, Suite A
P.O. Box 4043
Springfield, MO 65804
*rloomer@trdlp.com*
*jdavis@trdlp.com*
417-883-2102 (phone)
417-883-5024 (fax)


     */s/ Rodney E. Loomer*
By_____
     Rodney E. Loomer, MO Bar #24013

     */s/ Jeffrey T. Davis*
By_____
     Jeffrey T. Davis, MO Bar #43855


and

     */s/ James D. Young*
By_____

James D. Young (**Pro Hac Vice to be filed**)
Florida Bar No. 567507
jyoung@forthepeople.com
**MORGAN & MORGAN COMPLEX**
**LITIGATION GROUP**
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904) 398-2722

Jay Angoff
Mo. Bar No. 46415
MEHRI & SKALET, PLLC
1250 Connecticut Ave, NW, Suite 300
Washington, DC 20036
PH: 202 822-5100
jangoff@findjustice.com

*Attorneys for Plaintiff*